UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA                    CASE NO.:3:14-cr-40-J-20MCR

v.

CHARLES FRANKLIN HUDSON, JR.

## HUDSON'S NOTICE OF FILING A COMPREHENSIVE MITIGATION REPORT PREPARED BYTHE CORD STRATEGIES GROUP, LLC

**COMES NOW,** the Defendant, Charles Franklin Hudson, Jr. (Hudson), by and through

undersigned counsel, and respectfully submits the following report prepared by the Cord Strategies

Group on behalf of Hudson.

Dated this 16ᵗʰ day of February, 2015.

Respectfully submitted,

/s/ Roland Falcon
ROLAND FALCON, ESQUIRE
Florida Bar No.: 118516
233 E. Bay Street, Suite 1010
Jacksonville, Florida 32202
Office: (904) 350-9960
Fax:   (904) 358-6610
Cell:   (904)614-4040
Email:rolandfalcon@rfalconlaw.com
ATTORNEY FOR HUDSON

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was furnished to AUSA Rodney Brown, 300 N. Hogan Street, Jacksonville, Florida, 32202 by Electronic Mail this 16th day of February, 2015.

/s/Roland Falcon

ATTORNEY

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                              Case No. 3:14-cr-40-J-20MCR

Charles Franklin Hudson Jr.,

    Defendant

---

## COMPREHENSIVE SENTENCING MITIGATION REPORT

### Prepared by The Cord Strategies Group, LLC
### Jacksonville, Florida

## Contents

Introduction                                                                                    1

Current Posture of the Defendant                                                 1

The Nature and Characteristics of the Offense/Factors in Mitigation of the
Offense                                                                                          2

History and Characteristics of the Defendant                                  3

Issues of Therapeutic Concern                                                       8

Statistical Information                                                                     8

Factors Militating in Favor of a Variance from the Advisory Guidelines     10

Judicial Attitudes toward Sentencing Mitigation                              10

Conclusion                                                                                    11

Appendix Exhibits A through E                                                     App.

## Comprehensive Mitigation Report for Charles Franklin Hudson Jr.

### Introduction

According to the provisions of 18 U.S.C. § 3553, the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with statutory purposes of sentencing, and in determining such sentence, the court shall consider, inter alia, (1) the nature and circumstances of the offense and the history and characteristics of Mr. Hudson, and (2) the need for the sentence imposed as set forth in § 3553(a)(2). In consideration of the sentence that must be imposed in this case, Charles Franklin Jr. respectfully requests that the Court consider the following information in mitigation of his sentence:

### Current Posture of Mr. Hudson

#### Mr. Hudson's Response to His Status

"I know that this does not excuse my conduct, but at the time I committed these offenses I was depressed, drinking heavily, and working sometimes 120 hours a week."[1]

#### Family's Response to Defendant's Status

Outside of the tremendous harm to the victim in this case, the most significant impact of Mr. Hudson's conduct falls on his mother, Therese Hudson. Ms. Hudson is currently age 56 and suffers from a variety of serious and life-threatening medical conditions, such as cirrhosis of the liver, dementia, and throat cancer. She has a tracheotomy tube to facilitate her breathing, and currently receives nutrition through a feeding tube in her stomach.[2] Ms. Hudson is currently being cared for by her sister, Cheryl Johnson, age 60. Ms. Johnson indicated that Ms. Hudson's conditions is worsening daily, and that she was hoping for Mr. Hudson's intervention and assistance in taking care of his mother in the future. Mr. Hudson will not be able to help his mother following the imposition of the sentence in this case.

---

[1] Hudson, Charles Personal interview. 26 November 2014.

[2] Johnson, Cheryl Personal interview. 2 February 2015.

1

*Collateral Consequences of the Offense*

In addition to the usual consequences of incurring a felony conviction, such as loss of the privilege of voting, Mr. Hudson will be forever labeled as a sex offender, and will be forced to spend his remaining years incurring the implications of such stigma. This is especially noteworthy because prior to his involvement in the relevant conduct to the instant offense, Mr. Hudson had no history of criminal conduct involving children. He will be 39 years of age at the time of sentencing, and the designation of sexual offender will effectively be a label for his lifetime. In being branded as a sex offender, Mr. Hudson will become a pariah, and will likely incur all of the social dislocations of persons similarly situated who have trouble with housing, employment, and community relations.

### The Nature and Circumstances of the Offense/ Factors in Mitigation of the Offense

There are several factors in mitigation of the offense that may be pertinent to the provisions of USSG §1B1.4 (Information to Be Used in Imposing Sentence; Selecting a Point within the Guideline Range or Departing from the Guidelines).[3] These factors, in combination, militate in favor of the position that the background, character, and characteristics of Mr. Hudson are relevant to the commission of the instant offense.

First, Mr. Hudson has only two criminal history points, which is the lowest total possible for inclusion into criminal history category II, which distinguishes him from defendants having three points. Both points come by way of misdemeanor convictions. Second, although the instant offenses are especially egregious, there is no indication that Mr. Hudson has a prior history of harming any minor victims other than the victim in this case. Third, during the time constituting the earliest dates of relevant conduct, Mr. Hudson was suffering from depression in response to the death of his brother, as well as

---

[3] A court is not precluded from considering any information that the guidelines do not take into account in determining a sentence within the guideline range, or from considering that information in determining whether and to what extent to depart from the guidelines. USSG §1B1.4, comment. (backg'd.)

2

experiencing substantial alcohol dependency, vis-à-vis binge-drinking, with possible connections to the use of physician-prescribed anti-depressants.[4]

## History and Characteristics of Mr. Hudson

### Parents/Nuclear Family Circumstances

Prior to Mr. Hudson's birth, his mother became pregnant after being raped by his paternal grandfather's brother, Tom Henry Hancock.[5] In the aftermath of the rape, his grandfather shot and killed the perpetrator. The grandfather was sentenced to the equivalence of the term of six months home detention. The rape, and the killing of Ms. Hudson's perpetrator, precipitated a long course of depression in Mr. Hudson's mother.[6] Mr. Hudson further indicated that his mother subsequently married his father, a marriage that was continually affected by conflicts between his parents and other familial disorder.

Beginning at age six, Mr. Hudson lived with his family in an abandoned house in West Virginia.[7] He indicated that due to his father's unwillingness to work, the family survived off welfare. Mr. Hudson stated that his father did not really want children, causing him to physically and mentally abuse Mr. Hudson on a frequent basis. Mr. Hudson stated that this abuse epitomized his father's attitude toward him because his father was something of a perfectionist. Mr. Hudson reported that his father beat him severely for the slightest transgressions, such as failing to feed the dog by a certain time each day. Mr.

---

[4] The conduct charged in the Indictment occurred from May 17, 2011, through June 28, 2012. Salient dates from the defendant's personal history from 2009 include the death of defendant's brother and accompanying depression; the beginning use of Wellbutrin, motorcycle accident injury; motor vehicle accident injury; and an inexhaustible work-hour schedule.

[5] Johnson, Cheryl. *Id.* According to Ms. Johnson, this child was born with cystic fibrosis, and was severely learning impaired. The child was taken from Mr. Hudson's mother and reared by her parents who lived next door.

[6] *Ibid.*

[7] *Ibid.*

3

Hudson stated that the beatings usually included at least 20 lashes with a belt, and occurred on an average of three to five times weekly.

Mr. Hudson reported that at age six, he began suffering from fecal incontinence.[8] He was retained at the completion of the first grade.[9] The fecal incontinence condition continued until beyond age 12. Mr. Hudson reported that his father responded to this circumstance by using corporal punishment on Mr. Hudson to address the problem. Mr. Hudson indicated that he was referred to a psychiatrist, but cannot recall his particular diagnosis. He does recall, however, the psychiatrist constantly asking him if he had been, or was being, sexually molested. Mr. Hudson reported that he cannot recall whether or not he was sexually molested during preadolescence.

Mr. Hudson reported that at age nine, he began seeing another psychiatrist for emotional problems, this time at Shawnee Hills Medical Center. He indicated that his relationship with his father had become virtually barbaric, based on the regularity and intensity of the beatings, and that he could not get along with him at all. Mr. Hudson indicated that he had suicidal ideations, among other psychological problems. Mr. Hudson stated that he received weekly counseling for almost a year.

Mr. Hudson reported that, simultaneously with his problems within his family, his early-age, educational experience was problematic. He stated that beginning in the middle school, he was placed in a program for "behavioral disorder isolation," referred to as the "BDISU" program. Mr. Hudson stated that this program was for students deemed to be too disruptive for regular classes, with each class consisting of eight students, staffed by two adults. He indicated that he thinks that his problems at home, particularly with regard to his parents' divorce, contributed to his behavior at that time. Mr. Hudson

---

[8] According to medical literature, fecal incontinence is associated with several characteristics exhibited by the defendant, such as aggressive behavior, depression, disruptive behavior, learning disabilities, and oppositional behavior. Exhibit A. Faecal Incontinence in Children. Epidemiology, Pathophysiology, Clinical Evaluation and Management. From the World Wide Web, http://www.medscape.com/viewarticle/776167_4, p. 4.

[9] Appendix B. Records from Kanawha County, West Virginia Schools.

4

indicated that his placement in the BDISU program ended in the ninth grade. Mr. Hudson also recalls that he was designated as "learning disabled," and "slow learning disabled" during an educational evaluation period. He stated that his mother made an incomplete attempt to have him certified as developmentally disabled by the Social Security Administration.

### Later Adolescence

At age 15, Mr. Hudson reported that his father was detected cheating on his mother. When she confronted him about his infidelity, Mr. Hudson reported that his father pulled a gun and threatened to kill everyone in the house. Mr. Hudson reported that he was asleep when the incident began, but awoke in terror to observe his father's attack first hand. Law enforcement responded to the situation, and Mr. Hudson's father was temporarily and involuntarily committed for a psychological evaluation.[10] Civil authorities were not able to adjudicate a permanent commitment, and Mr. Hudson's father remained at liberty, continuing his menacing behavior. Mr. Hudson reported that for the next year, he and his mother lived in a series of temporary lodgings as they sought intermittent refuge from his angry father.

During their time as virtual fugitives from Mr. Hudson's father, his mother developed cirrhosis of the liver, and, in addition to other medical problems, became 100 percent disabled. As the presentence report indicates, Mr. Hudson's mother also suffered from a stroke, and developed cancer. Mr. Hudson's mother is currently on her sixth iteration of treatment for cancer.[11] Ms. Johnson indicated that she has a tracheotomy tube which impairs her speech, and that she is confined to a wheelchair.

Due to a lack of financial means, Mr. Hudson and his mother were forced to live in public housing developments in West Virginia. He indicated that for the longest period of time they lived in a project

---

[10] According to Ms Johnson, the committing facility, formerly known as the Weston State Hospital, was closed prior to 2000

[11] Johnson, Cheryl. *Id.*

5

known as Orchard Manor, a high density multi-unit apartment complex laden with crime, drugs, and poverty. Mr. Hudson indicated that he was the victim of gun shots attempts regularly in this environment. At age 17, he reported that he and his mother finally moved to a mobile home after she received proceeds from her disability settlement.

As reflected in the presentence report, at some point after moving into the mobile home, Mr. Hudson's mother evicted him because of a dispute over money. He stated that in response to this circumstance, he moved into the home of his girlfriend, Melissa Shackleford, who was age 15. Mr. Hudson reported that he impregnated Ms. Shackleford for the first of four times when he was 17. The child did not survive the pregnancy. Mr. Hudson indicated that as a response to this pregnancy, Ms. Shackleford's mother allowed her daughter to sleep in the same bed with Mr. Hudson, with the proviso that they use some form of birth control. Mr. Hudson indicated that Ms. Shackleford became pregnant by him on three additional occasions, with each instance resulting in miscarriage. Mr. Hudson reported that his relationship with Ms. Shackleford subsequently ended when she had a child by another man.

### Traumatic Experiences

Mr. Hudson's family has a long history of significant family psychological and psychiatric problems.[12] He reported that his mother has a long history of depression, and at various points in her life, lived essentially as a "hermit," and during her reclusive status, would only smoke cigarettes and eat minimal amounts of food. As reflected earlier in this report, she was the victim of a rape prior to Mr. Hudson's birth. Mr. Hudson reported that he has a now-deceased uncle, Kenny Hancock, whom he believed suffered from schizophrenia and bipolar disorder. Kenny committed suicide by shooting himself in the head. Mr. Hudson further reported that he has an aunt, Janet Hudson, who exhibits similar hermit-like tendencies as his mother, whom he believes has a diagnosis of a psychological disorder.

---

[12] Johnson, Cheryl. *Ibid.* Persinger, Sandra. Personal interview. 2 February 2015.

As reflected above, at the age of 17, Mr. Hudson was evicted from his mother's house, and was taken in by the mother of his former girlfriend, Melissa Shackleford. Since Ms. Shackleford's mother allowed Mr. Hudson to sleep with Ms. Shackleford, while both were underage, she may have indirectly contributed to their delinquency by allowing such an arrangement. This situation may also have contributed to a sexual precocious in Mr. Hudson, who was otherwise suffering from the lack of guidance as a youth.

Finally, the presentence report (¶ 67) indicates that in 2009, Mr. Hudson had a half-brother, Michael, who died in a car accident. Mr. Hudson amplified information about his brother's death by indicating that he was run over by a cousin who had been drinking. Mr. Hudson indicated that prior to his death, his brother was involuntarily committed following an incident during which he fired shots at a police officer. Mr. Hudson is not aware of his brother's diagnosis emanating from the psychological evaluation.

Mr. Hudson reported that he became depressed following the death of his brother in 2009. He indicated that he sought treatment from Dr. Gregory McHugh of the Baptist Primary Care system. Mr. Hudson indicated that the treatment included the administration of the anti-depressant Wellbutrin. The year 2009 was also remarkable in that it marked the first time that Mr. Hudson began sexually fondling the minor victim. Although, according to the presentence report, Mr. Hudson began cohabiting with the victim's mother in 1998, there is no suggestion in the report that Mr. Hudson harmed the child prior to 2009 – a period of almost 11 years. This convergence of facts may suggest that the traumatic events in Mr. Hudson's life in 2009 had an inordinate impact both on his emotional stability and his capacity for sound decision-making.

The presentence report indicates that also in 2009, Mr. Hudson was involved in a motorcycle accident. The report does not indicate, however, that medical records were reviewed from this accident

7

to ascertain the full extent of the trauma to Mr. Hudson, and whether or not he may have sustained a head injury.

## Employment

As mentioned in the presentence report (¶ 82), from 2002 until January 2014, Mr. Hudson was employed as a tank tender for Ardaugh, Inc. As a tank tender, Mr. Hudson was exposed to extraordinarily long work hours and environmental hazards such as working with chemicals like soda ash. The presentence report reflects that in 2012 alone, Mr. Hudson's earnings were $101,049, based on $21.89 per hour. At that rate, Mr. Hudson would have worked 4,616 hours in the described environmental conditions. According to the standard 40-hour work week, the yearly number of work hours anticipated for the average American worker is approximately 2,000. Mr. Hudson relates that his off times were limited to four weekends per calendar year. Consequently, Mr. Hudson worked more than two times the number of hours than the average worker. Mr. Hudson was amenable to this work schedule during all times related to the instant offenses and their relevant conduct.

## Issues of Therapeutic Concern

As indicated by the offenses of conviction, Mr. Hudson has manifested conduct resulting in the sexual exploitation of a minor child. He acknowledges the need for treatment for sexual addiction. In addition, Mr. Hudson has reflected on the impact of his alcohol addiction and its implications for his current conduct, as well as other behavioral issues in his life. Furthermore, Mr. Hudson has been diagnosed with long term depression, and now realizes the relationship of this mental health condition to his overall wellbeing. He acknowledges the need for correctional treatment in each of these phases of therapy.

## Statistical Information

The Sentencing Commission ("Commission") maintains statistics on a combination of variables impacting the actual sentences imposed within the nation, the circuit, and the district that largely define

8

the comparative configurations of those sentences. A synopsis of the data is instructive in determining what constitutes a conventional range for the "heartland" of sentences imposed for particular offenses. With regard to the length of sentences by criminal history category (Category II) and primary offense guideline (i.e., USSG §2G2.1), for the past three statistical years (FY 2010-2012), the average sentence imposed nationally was 316 months (26 years, 4 months), against a median sentence of 288 months (24 years). Those statistics are based on a total of 58 cases. With regard to sentences imposed within the 11th Circuit over the same time frame, the sentences imposed were remarkably lower. The mean sentence imposed within the circuit was **188 months** (15 years, 8 months) and the median sentence imposed was **180 months** (15 years). These figures were based on five cases sentenced.[13] The figures for the Middle District of Florida were incomplete.

Against the backdrop of this statistical information, it is noteworthy that the sentencing information was based on the typical use of the base offense level and specific offense characteristics for the application of USSG §2G2.1.[14] Nationally, in fiscal year 2013, virtually all of the cases sentenced under this guideline (98 percent) began the calculations with the highest base offense level of 32. With regard to the frequency of the application of the main specific offense characteristics, all except one – the four-level increase for commission of a sexual act as described in 18 U.S.C. § 2241(a) – occur in a great number of the cases that resulted in the sentencings. With respect to the two-level increase for the victim being between the ages of 12 and 16, more than one-third of the cases under 2G2.1 apply this adjustment. The increase for the offense involving sadistic or masochistic conduct was applied at a frequency of 22.7 percent. The incident of one of the more prominent features of the instant case – the involvement of a

---

[13] Exhibit C. U.S. Sentencing Commission, 2012-2012 Datafiles, USSCFY2010-2012.

[14] Appendix Exhibit D. U.S. Sentencing Commission: Use of Guidelines and Specific Offense Characteristics (Guideline Calculation Based), FY2013.

9

parent or guardian in the offense – was almost 59 percent of the cases employed for this specific offense characteristic. Only the four-level increase for the "commission of a sex act" was applied with a remarkably less frequency at a rate of six percent.

Overall, the frequency rates for the application of the base offense level and specific offense characteristics suggests that there is a great commonality among the conduct of persons within the nation that are being sentenced under USSG §2G2.1. By most of these measures, the conduct of Mr. Hudson – as deplorable as it was – was comparable to most other defendants convicted for the same offense. This factor should be considered by the court when comparing the average and median sentences imposed on other similarly situated defendants vis-à-vis the sentence the court must impose on Mr. Hudson.

### Factors Militating in Favor of a Variance from the Advisory Guidelines System

According to the presentence report, the advisory guideline imprisonment sentence is 720 months (60 years) based on the allowance for the "stacking" of the statutory maximum for the two counts of conviction. As is clear from the statistical information, even the highest figure of 316 months based on the national average is substantially less than the guideline sentence of 60 years. As established earlier, a reliable "heartland" for cases under these circumstances may comport in an average range of sentences from as low as 188 months to 316 months for similarly situated defendants. Consequently, a variance from the advisory guideline system may be suggested, and an attempt made, to calibrate the impending sentence to something closer to a point between the national and 11th Circuit averages, if not the median sentences.

### Judicial Attitudes toward Sentencing Mitigation

Federal Judges are amenable to the consideration of a wider spectrum of factors that courts should consider at sentencing. In the Sentencing Commission's 2010 survey on the attitudes of United States District Judges, the jurists responded to a question regarding the appropriateness of the guideline

for various types of sentences.[15] Regarding the offense of production of child pornography, although a majority of judges felt that the guideline range was appropriate for these offenses, a double-digit number (13 percent) of the jurists felt that the range was too high. Accordingly, even in offenses as serious as the instant offenses against Mr. Hudson, some judges concur with the rule of parsimony and exercise a bias toward imposing the least onerous sentence possible under the law.

## Conclusion

In consideration of the forgoing discussion and analysis, there are a number of circumstances in Mr. Hudson's history and characteristics that suggest a reliable nexus with the nature and circumstances. Further, statistical information from the Sentencing Commission reveal that there are other defendants comparably situated with Mr. Hudson, who have received sentences far less that recommended by the advisory guidelines. Consequently, the Court may carefully consider this information to fashion a sentence that is at variance with the advisory guidelines system. Mr. Hudson thanks the Court for its time and consideration in reviewing this report. Mr. Hudson respectfully requests that the Court utilize this information to impose a sentence that is "sufficient but not greater than necessary" under the circumstances of this case.

---

[15] Appendix Exhibit E. Results of Survey of United States District Judges, January 2010 through March 2010: Guideline Application; Question 8. Appropriateness of Guideline Ranges, from World Wide Web, http://www.ussc.gov/research.

11

The forgoing comprehensive sentencing mitigation report has been prepared on behalf of Mr. Hudson at the request of defense counsel, and is submitted in support of sentencing on February 18, 2015, at 10:00 a.m., before the Honorable Harvey E. Schlesinger, Senior United States District Judge in the United States District Court, Jacksonville Division.

Respectfully submitted,

Carlos R. Dawson
Sentencing Mitigation Consultant
The Cord Strategies Group, LLC
5252 Clapboard Creek Drive
Jacksonville, FL 32226
(904) 910-5059
(904) 696-1111 fax
e-mail: crd@cordstrategiesgroup.com

Comprehensive Sentencing Mitigation Report for Charles Franklin Hudson Jr.

**Appendix Exhibits**

A. Study on Fecal Incontinence
B. Kanawha County Schools Records
C. United States Sentencing Commission Datafiles – USSG 2G2.1 (FY2010-2012)
D. United States Sentencing Commission – Use of Guidelines and Specific Offense Characteristics (FY2013)
E. Results of Judge's Survey – Question 8

# EXHIBIT A

www.medscape.com

# Review Article: Faecal Incontinence in Children: Epidemiology, Pathophysiology, Clinical Evaluation and Management

S. Rajindrajith, N. M. Devanarayana, M. A. Benninga

Aliment Pharmacol Ther. 2013;37(1):37–48.

## Abstract and Introduction

### Abstract

**Background** Faecal incontinence (FI) in children is a significant gastrointestinal problem, with great personal and social impacts. It is characterised by recurrent loss of faecal matter into the underwear. Both functional and organic causes contribute to its aetiology with the former predominating.

**Aim** To review the epidemiology, pathophysiology, clinical evaluation and management of functional faecal incontinence in children.

**Methods** A PubMed search was conducted using search terms f(a)ecal incontinence, and encopresis. Articles on epidemiology, pathophysiology, clinical evaluation, investigation and management of functional FI in children were retrieved and assessed.

**Results** Community prevalence of this distressing problem ranges from 0.8% to 7.8% globally. Male: female ratio varies from 3:1 to 6:1. The diagnosis of FI is often based on established clinical criteria. The majority (82%) have constipation associated functional FI. Biopsychosocial factors play a crucial role in the pathogenesis. Limited physiological testing of anorectal function is recommended in the diagnostic procedures, particularly in children with atypical symptoms and possible organic disorders. Management of FI needs a multidisciplinary approach which includes establishment of an effective doctor-patient partnership, understanding the underlying mechanisms, pharmacotherapy and behavioural treatment. Approximately 15% of children with functional nonretentive faecal incontinence (FNRFI) had the same symptoms at the age of 18 years.

**Conclusion** Significant therapeutic advances have been made for retentive faecal incontinence, but treatment options for functional nonretentive faecal incontinence are limited. Limited long-term outcome data show that the majority outgrow faecal incontinence. A substantial proportion of children progress to adulthood with faecal incontinence.

### Introduction

Faecal incontinence (FI) is a paediatric gastroenterological problem with profound personal and family impacts.[1] The affected children present with a history of voluntary and/or involuntary passage of stools into the underwear.[2] The characteristic aroma of faeces in these children predisposes them to stigmatisation, rejection and bullying at school, which subsequently result in school avoidance and social withdrawal.[3]

Faecal incontinence was originally described in children who were neurologically handicapped. Subsequently, it had been observed in a significant percentage of otherwise healthy children.[4] Irrespective of the differences in underlying pathology (organic or functional), these children have significantly lower quality of life and most of the time suffer silently.[5, 6] Therefore, it is not surprising that they develop behavioural, emotional and upbringing problems, learning difficulties, depression and also frequently subjected to maltreatment.[7] This review appraises the definitions, epidemiology, pathophysiology, diagnostic evaluation, therapeutic advances and clinical care of children with functional FI.

## Methods

The goal of this article is to review the current literature on functional faecal incontinence. A comprehensive search of the published literature was conducted in PubMed using the key words f(a)ecal incontinence and encopresis. They were combined with MeSH terms, epidemiology, pathophysiology and management. The search was limited to articles in English in full manuscripts form on preschoolers, children and adolescents. Children with organic faecal incontinence (post surgical and neurological) were excluded. References within studies that were relevant to the topic were manually searched. Abstracts of articles identified were reviewed, and the full-text of articles related to functional constipation associated FI and functional nonretentive FI were retrieved and reviewed in depth. Relevant articles from adult literature were also included when there was a dearth of evidence from paediatric studies.

## Definitions

FI denotes passage of stools into underwear in a child over the age of 4 years. This term replaces the previously used terms encopresis and faecal soiling. FI could be of functional or organic in origin. The common reasons for FI are listed in . The scope of this article is to understand functional FI and hence the organic causes for FI will not be discussed further.

Table 1. Causes of faecal incontinence in children

| Functional causes |
| --- |
| Functional constipation associated faecal incontinence |
| Functional nonretentive faecal incontinence |
| Organic causes |
| Repaired anorectal malformations |
| Post surgical Hirschsprung disease |
| Spinal dysraphism |
| Spinal cord trauma |
| Spinal cord tumours |
| Cerebral palsy |
| Myopathies affecting the pelvic floor and external anal sphincter |

Depending on underlying pathophysiological mechanisms, functional FI is broadly classified into retentive and nonretentive FI (FNRFI), using the latest Rome III classification of paediatric functional gastrointestinal diseases.[8] Children with retentive FI fulfil the criteria for constipation, and have a rectum loaded with faeces leading to overflow incontinence. In contrast, those with FNRFI have no evidence of faecal retention.[8] The Rome III definition for functional constipation and functional nonretentive faecal incontinence are summarised in . These criteria appear to be useful in both clinical and research fields to diagnose functional FI in children.

Table 2. Rome III definitions of functional constipation and functional nonretentive faecal incontinence

| Functional constipation |
| --- |
| Diagnostic criteria* must include two or more of the following in a child with a developmental age of at least 4 years with insufficient criteria for diagnosis of IBS: |

- Two or fewer defecations in the toilet per week

- At least one episode of faecal incontinence per week

- History of retentive posturing or excessive volitional stool retention

- History of painful or hard bowel movements

- Presence of a large faecal mass in the rectum

- History of large diameter stools which may obstruct the toilet

Functional nonretentive faecal incontinence

Diagnostic criteria† must include all of the following in a child with a developmental age of at least 4 years:

- Defecation into places inappropriate to the social context at least once per month

- No evidence of an inflammatory, anatomic, metabolic or neoplastic process that explains the subject's symptoms

- No evidence of faecal retention

*Criteria fulfilled at least once per week for at least 2 months prior to diagnosis.

†Criteria fulfilled for at least 2 months prior to diagnosis.

Adopted from Ref.[8]

## Epidemiology

FI is estimated to affect 0.8–4.1% children in Western societies.[3, 7] Recent studies from Asia have shown FI to be a significant problem in Iran, South Korea and Sri Lanka, ranging from 2% to 7.8%.[9–11] Recently a Sri Lankan study including children of 10–16 years, has reported a higher prevalence of FI in younger children at the age of 10 years (5.4%), while in children aged 16 years a much lower prevalence was reported (<1%).[11] A study from the Netherlands also noted that children of 5–6 years have higher odds of developing FI than children of 11–12 years,[7] indicating possible maturity of bodily functions. Several studies have noted that the majority of children with functional FI present for medical attention between 7 and 8 years of age.[12–14]

Functional FI is either due to retentive (constipation associated) or functional nonretentive FI. Epidemiological studies in the past have not attempted to differentiate these two entities. It is important to differentiate between retentive and nonretentive FI as these two conditions differ in aetiology and management. In a previous epidemiological survey we have shown that retentive FI (constipation associated FI) is 4.5 times commoner than FNRFI, underscoring the significance of constipation in the aetiology of FI.[11]

Hospital based studies have reported functional FI in 3–4.4% of children attending general paediatric clinics[12, 13] and 21% attending tertiary care paediatric gastroenterology units.[14] Until recently, FI and constipation were regarded as psychiatric disorders and some of these children were managed at psychiatry clinics. Infact, 5.7% of the children attending a psychiatric unit were found to have FI.[15] In many previous studies (both community and hospital based), prevalence of FI is significantly higher in boys, with a male to female ratio varying from 3:1 to 6:1.[7, 11, 13, 14, 16–18]

### Risk Factors for Functional FI

Biopsychosocial factors play a pivotal role in the onset and continuation of symptoms in children with FI (Figure 1). Two studies have indentified low socioeconomic background as a risk factor for functional FI in children.[7, 11] Inadequate toilet facilities and unclean or unhygienic toilets may be discouraging these children from using toilets, leading to stool withholding and retentive FI. Delay in seeking health care for defecation disorders, such as constipation, would also be a probable contributory factor for FI in such socioeconomic backgrounds. Other risk factors possibly contributing to retentive FI are living in urban areas[19] and war affected zones.[20]



**Figure 1.**

Biopsychosocial model of functional faecal incontinence. FI, faecal incontinence.

Hospitalisation of the child for another illness and bullying at school have also been suggested as risk factors for FI.[3, 11] Psychological and behavioural abnormalities like aggressive behaviour, social withdrawal, anxiety, depression, disruptive behaviour, and poor school and social performances were commonly noted in children with functional FI.[21, 22] Learning difficulties, upbringing problems and oppositional behaviour, were also noted to be higher in these children.[3, 7] Analysis of child behaviour checklist had shown that approximately one-third of children with FNRFI had psychological disturbances and behavioural problems.[23, 24]

Psychological stress is known to alter the output of the brain-gut axis in functional gastrointestinal diseases such as irritable bowel syndrome.[25, 26] Similarly, altered functions of brain-gut axis, triggered by psychological abnormalities, probably result in changes of anorectal functions in these children leading to functional FI.

## Pathophysiology

### Constipation Associated (Retentive) Faecal Incontinence

FI is a significant problem associated with functional constipation. Both epidemiological and hospital studies have shown FI in 75–90% of children with constipation.[14, 27] A recent epidemiological survey has shown that 80% of children with FI are suffering from constipation.[11] Incontinence of

faeces can occur both during the day and at night. Nocturnal incontinence is considered to be an indicator of severe accumulation of faeces in the rectum.

The primary reason for FI in constipation is faecal retention. Faecal retention is common in children with stool withholding behaviour and painful defecation. When a child feels the urge to pass stools, knowing that this process would lead to pain, he or she hides, stands on tip toe and contracts external anal sphincter, pelvic floor muscles and gluteal muscles to suppress defecation. Faecal retention in the rectum leads to a cascade of physiological and pathological consequences. Voluntary suppression of desire to pass stools leads to prolongation of total and segmental colonic transit times, aggravating faecal retention and leads to stool accumulation in the entire colon (megacolon).[28] Furthermore, mechanical rectal distension is known to inhibit motor activities of right and left hemicolon and sigmoid colon by a reflex mechanism.[29–31] These intestinal reflexes further suppress defecation. Water is absorbed from the retained stools through rectal mucosa leading to hard stools. In addition, abnormally low chloride secretion due to abnormalities in noncalcium mediated chloride channels in the rectal mucosa may further contribute to development of dry and hard faecal masses.[32]

This process creates a vicious cycle of progressive accumulation of faeces and hardening of the faecal mass. Rectum and sigmoid colon gradually dilate causing megarectum and megacolon which lead in diminished propulsive contractile forces of the rectal musculature.[33, 34] In addition, rectal sensitivity is blunted due to intrinsic rectal hyposensitivity[35] or due to constant accumulation of faeces.[36] Finally, semi-liquid faeces seeps between the faecal mass and rectal wall, and escapes through the anal canal when the sphincter muscles are relaxed. The volume of stools that leaks out is small and most of the time just stains the underwear.

### Functional Nonretentive Faecal Incontinence (FNRFI)

Children with FNRFI pass stools into inappropriate places without evidence of stool retention. The majority of them have complete evacuation of bowel, not just staining of the underwear as in retentive incontinence. The pathophysiology of FNRFI is still far from clear.

In patients with FNRFI, total and segmental colonic transit times are within normal limits.[24, 37, 38] Abnormalities in defecation dynamics, shown upon anorectal manometry, include inability to relax the external anal sphincter during defecation. It is likely to be an acquired control mechanism in which after the loss of the first stool in the underwear, the child contracts the external anal sphincter to retain the rest of the stool.[23, 37] In contrast with retentive FI, the rectal compliance and sensitivity thresholds as measured by rectal barostat were normal in these children. In addition, barostat studies have also not revealed abnormalities in anorectal function in children with FNRFI.[39] It is unlikely that the altered physiological functions of the large bowel such as colonic transit, rectal compliance or sensitivity are responsible for FNRFI. Psychosocial factors and deranged defecation dynamics may play a role in the pathogenesis. Further studies are needed to evaluate other possible pathophysiological mechanisms of FNRFI.

## Evaluation of a Child With FI

### Clinical History

In the majority of patients, a thorough history and complete physical examination are sufficient to establish the diagnosis of FI and the underlying pathology.[40] The initial consultation for FI may be embarrassing to the child as well as to the parents. Therefore, the paediatrician should listen attentively and put them at ease during consultation. It is very important to ask relevant questions, as child and family are unlikely to come up with details of symptoms. The physician should assure the child and the family that their complaints are being taken seriously. A good rapport with the family is helpful to extract all important information needed to ensure optimum care for the child.

Elaborate history on bowel habits is the key element in the history. Typically, children with FNRFI pass complete bowel motion into the underwear. Passing small amount of stools which denotes overflow incontinence is usually present in severe constipation.[8, 13] The diurnal variation of incontinence is also important to asses as nocturnal faecal leak is associated with severe constipation. In contrast, children with FNRFI have accidents during day time, usually in the afternoon.[27] Reduced frequency of bowel motions, bulky stools, withholding posture, hard stools and pain or difficulty in passing stools are features suggestive of functional constipation.[41] In contrast with this, if the child does pass stools regularly in the toilet and passes one bowel motion in the underwear at least once a month without pain or difficulty, is more in favour of FNRFI.[42] Children with functional FI are often noted to have associated urinary symptoms. Daytime wetting has been reported in 29% to 34% children with FI. Furthermore, urinary tract infection is seen in 11% of these children.[43]

It is important to identify problems, such as social isolation, excessive dependency, behavioural and emotional upbringing problems, learning difficulties, anxiety, depression and possible child maltreatment which are often associated with FI.[7, 13, 22, 23] These often contribute to poor quality of life. Addressing these co-morbidities is important in successful management.

By definition FNRFI is only diagnosed in children whose developmental age is over 4 years.[8] Furthermore, FI is often seen in children with developmental abnormalities. Therefore, a detailed developmental assessment is crucial in the evaluation of a child with FI. This part is often neglected in the assessment of a child with FI and need to be specially emphasised. In addition, previous medical and surgical history including corrective surgeries of the anorectum would be helpful to rule out possible organic causes of FI.

Physical Examination

A thorough physical examination, including general, abdominal and neurological evaluation together with a digital rectal examination, is mandatory in assessing children with FI. Smell of faeces and general demeanour of the child are also important to note. Interaction between parents and the child will give clues to a strained relationship between them. General examination should concentrate on growth parameters and subtle dysmorphic features (which may be associated with constipation).[44]

Presence of palpable faecal masses in the lower abdomen in a child with FI indicates long standing stool retention.[45] Examination of spine and perianal area is important when assessing a child with FI. Perianal fissures are a feature of chronic constipation. Perianal examination could also reveal surgical scars which would be suggestive of an organic pathology such as repaired anorectal malformations.

Digital examination of the rectum is one of the crucial steps in evaluating a child with FI. Clinicians should explain the importance of rectal examination to both parents and the child before performing it, to alleviate any fears and anxieties. In addition, this examination should be performed by a clinician who is experienced enough to detect and interpret the physical findings.[46] First, the examiner should assess the resting tone of the sphincter. Then a voluntary squeeze will provide information on neuromuscular integrity of perineal muscles and external anal sphincter.[47] Large faecal masses are found in the rectum of over 90% of the children with constipation associated FI.[48] Children with FNRFI show no retention of stools.[49] The differences in clinical characteristics between retentive and nonretentive FI are summarised in .

Table 3. Clinical characteristics of retentive and nonretentive faecal incontinence

| Clinical feature | Nonretentive faecal incontinence(%) | Retentive faecal incontinence(%) |
|---|---|---|
| Abdominal pain | 30–46 | 41–66 |

| Large diameter stools | 0–20 | 61–80 |
|---|---|---|
| Posturing | 10 | 78 |
| Painful motions | 20–30 | 50–75 |
| Blood in stools | 10 | 56 |
| Night time faecal incontinence | 12 | 30 |
| Enuresis | 40–45 | 25–29 |
| Palpable abdominal mass | 0 | 35 |
| Palpable rectal mass | 0 | 31 |

Adopted from Refs.[11, 37, 91]

Investigations

FI is a clinical diagnosis which is mainly based on history and examination. There are a few investigations which are useful in some patients in whom the underlying pathology for FI is not quite clear, as well as for those not responding to standard treatment. For these patients with FI, physiological testing can be very useful both for confirming the diagnosis and for assessing objective improvement after the intervention.[50]

**Abdominal X-ray.** A plain abdominal radiograph has been a routine investigation to assess faecal loading and to identify megarectum and megacolon in children with constipation associated FI. Several scoring systems have been published to assess faecal loading.[51–53] All these methods have wide inter- and intra-observer variability.[27, 54] Furthermore, there is no scientific evidence to suggest that abdominal X-ray enhances the diagnosis or changes the management in a meaningful way.[55]

Berger and colleagues, in a systematic review on the value of radiological tests in diagnosing constipation, showed that abdominal radiograph has a wide range of sensitivity (60–80%) and specificity (43–99%).[56] Another study using spinal X-rays has reported occult spinal defects in significant percentages of children with constipation (47.7%) and FNRFI (77.8%).[57] However, clinical significance of these findings is yet to be established. Based on these observations, plain abdominal radiograph cannot be recommended in evaluation of children with faecal incontinence, either to assess faecal loading or occult spinal defects.

**Colonic Transit Studies.** Radio-opaque markers are commonly used for assessment of colonic transit time.[58, 59] This simple non-invasive method provides information on colonic motor function and helps to localise the anatomical segments which contribute to delay in transit. In a Dutch study, 50% of children with constipation were found to have delayed total colonic transit of which 2/3 had a significant delay in the rectosigmoid transit.[38] Furthermore, colonic transit negatively correlated with severity of symptoms such as lower defecation frequency and frequency of FI. Follow-up data on these children have shown that children with delayed transit responded poorly to standard clinical management strategies.[38] Delayed total or segmental colonic transit times have been observed in children with constipation associated FI in two other studies.[60, 61]

Other transit studies using radio nuclear markers have reported similar results. For example, Cook *et al.*, studying 101 children with chronic constipation, reported retention of radioactivity in the proximal colon at 48 h in 50%, indicating delayed transit. Further analysis of images has shown that most of these children have delayed transit in ascending and transverse colon.[62]

Benninga and colleagues have compared colonic transit times of children with constipation associated FI and solitary encopresis (FNRFI). In this study, 50% of children with constipation

associated FI had significantly delayed total colonic transit time. In contrast, 88% of children with FNRFI had normal colonic transit times.[37] It was also noted that all mean segmental transit times (right colon, left colon and rectosigmoid) were significantly delayed in children with retentive FI compared with FNRFI.[24, 63]

A recent prospective study comparing children with constipation associated FI, FNRFI and recurrent abdominal pain observed longer total and segmental transit times in the former group.[24] These findings provide a rationale for recommending measurement of colonic transit time to differentiate constipation associated FI from FNRFI, when the clinical assessment is inconclusive.

**Anorectal Manometry.** Anorectal manometry with rectal sensory testing is the preferred method to diagnose functional weakness of external or internal anal sphincters. In addition, it is also able to detect abnormalities in rectal sensation and rectal compliance.[29, 47] Distension of a balloon in the rectum in a stepwise manner helps to determine the rectal sensory threshold and rectal compliance, and also to assess the level at which the child feels the urge and pain (maximum tolerable volume).

Manometric studies are useful to differentiate between constipation associated FI and FNRFI. It has been shown that children with constipation associated FI have higher threshold for rectal sensation [25 mL (5–360)] (largest volume of balloon to provoke rectal sensation) than those with solitary encopresis [15 mL (20–89)] (FNRFI). There was no difference in maximum anal resting tone between two groups and the proportion of children with abnormal defecation dynamics was nearly comparable (41% vs. 54%, constipation associated FI vs. FNRFI).[37] Another study involving a small number of children with constipation associated FI and FNRFI confirmed this finding.[64]

Using a rectal barostat, a significantly higher mean rectal compliance has been shown in children with constipation (22 mm) than in FNRFI (12 mm). Because of this higher compliance, children with constipation associated FI require a larger volume of stools to reach the intrarectal pressure that trigger the urge to defecate.[39] In addition, another comparative study between these two groups has shown that children with faecal incontinence (without constipation) had complete relaxation of internal sphincter before sensation of stools in the rectum.[65] When children with both constipation and faecal incontinence were compared with children with constipation only, the duration of relaxation of the internal anal sphincter, time to maximum relaxation and time to recover adequate resting tone are significantly higher within the former group.[63] This may probably contribute to the pathophysiology of incontinence which has not been described in children with FNRFI.

**Anal Endosonography.** Ultrasonography provides reliable information on the structural integrity of anal sphincters and the presence of faeces in the rectum. Endosonographic appearance of the normal anal canal has been well-documented in children.[66, 67] Endosonography in children with functional constipation and associated FI has revealed significant thickening of the internal anal sphincter.[68] Thickness of the internal anal sphincter notably correlates with the symptom score, soiling score, megarectum score on abdominal palpation and size of the megarectum on manometry.[68] No such abnormalities have been described in children with FNRFI. This investigation is painless and minimally invasive, but gives critical information regarding anal sphincters and their function to differentiate both entities.

**Other Investigations.** Other investigations including imaging of the spinal cord, contrast studies and colonic manometry have a limited value in evaluation of a child with functional faecal incontinence.

MRI of the spinal cord is only indicated in children with suspected organic diseases of the spinal cord on clinical history and physical examination.[37] Bekkali and co-workers noted that almost all patients with defecation disorders, who have had spinal abnormalities upon MRI, had abnormalities such as deviation of the gluteal cleft detectable on physical examination.[69]

Contrast studies such as contrast enemas, defecography and functional investigation such as saline infusion test have not been evaluated to differentiate constipation associated FI from FNRFI. Contrast

studies are more valuable when FI is due to post surgical causes such as corrected Hirschsprung disease and corrected anorectal malformation.[70] These films are helpful to precisely locate the position of the vagina and rectum which is essential for decision-making during the surgical repair.

Colonic manometry enables direct measurement of colonic motor activity. This test may suggest the presence of an underlying neuropathy or myopathy in children with intractable constipation.[71] Van den Berg et al. showed children with severe constipation had generalised colonic hypomotility and absence of colonic response to bisacodyl.[72] Colonic manometry data on FNRFI are not available.

In summary, the two functional tests namely, colonic transit studies and anorectal manometry, and endosonographic imaging of the anorectal sphincter complex are helpful in differentiating FNRFI from constipation associated FI and should be judicially used in situations where clinical distinction is not apparent. Other studies usually used in children with FI are only helpful to diagnose organic disorders and therefore only need to be considered when there is clinical evidence of organic diseases.

## Management

### Education and Demystification

It is important that both parents and the child have a basic understanding of the pathophysiology of FI for effective management. The paediatrician should explain the underlying causes for FI using simple language and drawings if necessary. During consultation, adequate time and opportunity should be given to the parents and the child to express their views and concerns, and to clear any doubts. This process alleviates anxiety, eliminates false beliefs and helps to build a good therapeutic alliance between the physician and the family. This is very important to augment the compliance of future management steps.[48, 73, 74]

There is very little research data on this important aspect in management of FI. A previous study conducted in children with functional defecation disorders (both retentive FI and FNRFI) has shown that 15% of affected children improve with a non-accusatory approach to management including education, demystification and toilet training. This underscores the importance of non-accusatory education and demystification in the management of functional FI.[75] Figure 2 summarises the management of FI in children.



**Figure 2.**

Management algorithm of functional faecal incontinence. FI, faecal incontinence; PEG, polyethylene glycol.

### General Measures

FI leads to constant or episodic leaking of stools. Liquid stools in particular contain digestive enzymes that irritate and erode the skin, compromise integrity of the skin and affect the role of the skin as a protective barrier. In addition, vigorous scrubbing, in attempts to remove soiling, strips away the protective horny layer of the epidermis. This impairs both its integrity and efficiency to function as a barrier. Epidermis of children is replaced fairly quickly (every 26 days) than that of adults (48 days). Nevertheless, recurrent exposure to faecal matter can produce a vicious cycle of skin damage and inflammation, together with, loss of skin integrity.[76]

Prompt and gentle cleaning of the perianal area using moist wipes, rather than dry toilet paper after each episode of incontinence, is much more effective in preventing skin damage.[48] A barrier cream such as zinc oxide is useful to prevent skin excoriation. Perianal fungal infections associated with FI are treated with topical antifungal agents.[47, 77]

### Dietary Interventions

The therapeutic value of increase of dietary fibre intake has shown variable success in children with FI. Fibre supplements increase stool bulk and reduce watery stools, and hence are expected to reduce frequency of FI. However, there are no published data to support this approach.[47] So far, dietary fibre supplements have not shown a significant therapeutic efficacy in management of constipation associated FI.[78–80] There are no clinical trials on altering dietary fibre in children with

FNRFI. Therefore, modifying dietary fibre intake is still not recommended for children with functional FI.

## Pharmacotherapy

Pharmacotherapy for FI includes antidiarrhoeal drugs that reduce faecal output and laxatives that control constipation. There is a scarcity of well-designed randomised controlled trials on treatment of functional FI in children and there is little evidence to guide its management.

Loperamide is an opiate receptor agonist. It reduces diarrhoea by multiple mechanisms related to transport of water and electrolytes and inhibiting peristaltic movements (by inhibiting the release of acetylcholine and prostaglandin during bowel distension).[81, 82] Loperamide also increases the internal anal sphincter tone.[83] It has an excellent safety profile. Although it had been used in adults with FI,[83] experience in childhood faecal incontinence is limited. One case report has shown a significant clinical improvement of an adolescent with FNRFI following loperamide therapy.[84]

The main aim of pharmacotherapy for constipation associated FI is to empty the loaded rectum and to maintain soft stools during follow-up. Polyethylene glycol is shown to be effective in both disimpaction and preventing reaccumulation of stools. Children treated with polyethylene glycol had less episodes of FI,[85–87] lower frequency of re-impaction[88] and incurred significantly lower healthcare costs.[86] A systematic review has shown that polyethylene glycol is more effective in the treatment of constipation than other osmotic laxatives.[89]

However, other drugs such as senna and lactulose are also frequently used during the maintenance phase.[90] It is difficult to recommend one drug over another in management of constipation and associated FI, due to the lack of evidence on effectiveness of laxatives. However, judicious use of osmotic and stimulant laxatives, along or in combination is needed to prevent accumulation of faeces in the lower gut that predispose children to constipation associated FI.

Unlike retentive FI, nonretentive FI responds poorly to laxatives. In a prospective study, children treated with biofeedback with added oral laxatives had higher frequency of FI than the children with biofeedback alone.[91] The softened stools in children with FNRFI may have aggravated the symptoms.

## Biofeedback Therapy

Biofeedback training involves habit training based on reinforcement and uses instrument-assisted exercises designed to improve physiological control of sphincters. It enhances rectal sensations, strengthens the external anal sphincter, increases muscle coordination during contraction and relaxation and ultimately helps to achieve effective defecation as well as continence.[92] Biofeedback therapy improves defecation dynamics in children with constipation associated FI,[93] but has failed to achieve a significant improvement in the clinical outcome.[94] Similarly, children with FNRFI trained in biofeedback have not shown a better outcome than those on conventional therapy in the long-term follow-up, even after improvement of defecation dynamics.[23] Therefore, based on the currently available data, biofeedback has doubtful therapeutic value in the treatment of children with functional FI.

## Behavioural Therapy

Behavioural therapy (toilet training in combination with reward system and diminishing toilet phobia) in combination with cognitive therapy (psychotherapy, family therapy or educational support) aims to lower the distress, restore normal bowel habits by positive reinforcement and re-establish self respect. The process also encourages both the child and the parents to continue treatment.[42] Behavioural therapy has shown to be effective in reducing episodes of FI, when combined with intense medical management.[95] In a systematic review which analyse 18 trials conducted in children with functional retentive (constipation associated FI), the combined treatment of behavioural

interventions and laxatives improve FI more than laxatives alone.[96]

Behavioural therapy is the corner stone in the management of FNRFI as there is no convincing evidence on effectiveness of medical therapies. Structured toilet routine, maintaining a bowel diary and strict adherence to individualised behavioural programme are the only management options that have been found to be successful in FNRFI, so far.[18]

Behavioural therapy is a non-invasive treatment modality and it also provides a valuable insight to parents and children regarding the disease. Therefore, adding behavioural therapy to other conventional management seems a rational approach for the management of functional FI in children.

### Surgical Interventions

So far, surgical interventions are only reserved for intractable constipation associated FI. Antegrade continence enema (ACE) has shown to be useful in constipation associated FI in children. A study assessing 32 patients who had ACE treatment for intractable slow transit constipation has shown reduction in number of episodes of FI and abdominal pain, and improvement in mood. Disadvantages of this procedure is that some patients experience complications related to stoma, such as stenosis, mucus leak, faecal leak and catheter related pain.[97] Improvement in the surgical techniques such as laparoscopic placement of the tube has made the procedure more simple and acceptable to patients.

## Prognosis

Prognosis of childhood functional FI is generally variable. One study showed that approximately 50% of affected children develop at least one relapse with in the first 5 years after initial remission.[98] In this study the authors also found that children with retentive FI had less recovery rates. Furthermore, at the age of 16 years, one-third of children were still symptomatic, indicating the possibility of progression to adulthood.[98] However, a recent systematic review found that the majority of children with retentive FI recover within 6–12 months of treatment and the recovery has no relationship to the age of onset, family history and severity of the disease.[99]

Only one study has described long-term follow-up in children with FNRFI. In this study, 106 children with FNRFI were followed up for 10 years. The clinical success was defined as having less than one episode of FI in 2 weeks. The authors noted that after 2 years of medical and behavioural therapy in a tertiary care centre, only 29% of children had been successfully treated. When treatment success was analysed according to biological age, at the age of 12 years 49% of children were still suffering from FI. At the age of 18 years, 85% of patients with FNRFI were free of symptoms. This study clearly shows that at 18 years 15% of adolescents with FNRFI progress into adulthood with FI.[18] Therefore, contrary to the common belief that children with functional FI grow out of their symptoms, a significant subset of them suffer from FI as adults irrespective of the aetiology of functional FI.

## Conclusions and Future Research

Functional FI remains a chronic devastating gastroenterological problem in children, with a worldwide prevalence varying from 0.8 to 7.8%. The majority of them are suffering from chronic retentive FI while the other subset has FNRFI. Although pathophysiological mechanisms of retentive FI are fairly elucidated, mechanisms of FNRFI need further study. The diagnosis is usually based on established clinical criteria and judicial use of physiological testing is only indicated in children unresponsive to standard management. Although significant therapeutic advances have been made for retentive FI, further studies especially clinical trials using novel therapeutic agents are urgently needed. Treatment options for FNRFI are still limited and there are many unanswered questions about the management. Limited long-term outcome data show that the majority outgrow FI with advancing age. However, a substantial proportion of children progresses to adulthood with FI.

References

1. Bernard-Bonnin AC, Haley N, Belanger S, Nadeau D. Parental and patient perceptions about encopresis and its treatment. *J Dev Behav Pediatr* 1993; 14: 397–400.

2. Weissenberg S. Uber Encopresis. *Zeitschrift fur Kinderheilkd* 1926; 40: 674.

3. Joinson C, Heron J, Butler U, von Gontard A. Psychological differences between children with and without soiling problems. *Pediatrics* 2006; 117: 1575–84.

4. Bellman M. Studies on encopresis. *Acta Paediatr Scand* 1966; 170(Suppl.): 1+

5. Bongers ME, van Dijk M, Benninga MA, Grootenhuis MA. Health related quality of life in children with constipation associated faecal incontinence. *J Pediatr* 2009; 154: 749–53.

6. Wald A, Sigurdsson L. Quality of life in children and adults with constipation. *Best Pract Res Clin Gastroenterol* 2011; 25: 19–27.

7. van der Wal MF, Benninga MA, Hirasing RA. The prevalence of encopresis in multicultural population. *J Pediatr Gastroenterol Nutr* 2005; 40: 345–8.

8. Rasquin A, Di Lorenzo C, Forber D, *et al.* Childhood functional gastrointestinal disorders: child/adolescent. *Gastroenterology* 2006; 130: 1527–37.

9. Sohrabi S, Nouraie M, Khademi H, Bagqhizadeh S, Nasseri-Moghaddam S, Malekzadeh R. Epidemiology of uninvestigated gastrointestinal symptoms in adolescents: A populationbased study applying the Rome II questionnaire. *J Pediatr Gastroenterol Nutr* 2010; 51: 41–5.

10. Chung JM, Lee SD, Kang DI, *et al.* An epidemiologic study of voiding and bowel habits in Korean children: a nationwide multicenter study. *Urology* 2010; 76: 215–9.

11. Rajindrajith S, Devanarayana NM, Benninga MA. Constipation-associated and nonretentive fecal incontinence in children and adolescents: an epidemiological survey in Sri Lanka. *J Pediatr Gastroenterol Nutr* 2010; 51: 472–6.

12. Loening-Baucke V. Prevalence rates for constipation and faecal and urinary incontinence. *Arch Dis Child* 2007; 92: 486–9.

13. Levine MD. Children with encopresis: a descriptive analysis. *Pediatrics* 1975; 56: 412–6.

14. Voskuijl WP, Heijmans J, Heimans HS, Taminiau JA, Benninga MA. Use of Rome II criteria in childhood defecation disorders: applicability in clinical and research practice. *J Pediatr* 2004; 145: 213–7.

15. Olatawura MO. Encopresis, a review of thirty-two cases. *Acta Pediatr Scand* 1973; 62: 358–64.

16. Loening-Baucke V. Encopresis and soiling. *Pediatr Clin North Am* 1996; 43: 279–98.

17. Berg I, Jones KV. Functional faecal incontinence in children. *Arch Dis Child* 1964; 39: 465–72.

18. Voskuijl WP, Reitsma JB, van Ginkel R, Buller HA, Taminiau JA, Benninga MA. Longitudinal follow up of children with functional nonretentive fecal incontinence. *Clin Gastroenterol Hepatol* 2006; 4: 67–72.

19. Rajindrajith S, Devanarayana NM, Adhikari C, Pannala W, Benninga MA. Constipation in children: an epidemiological study in Sri Lanka using Rome III criteria. *Arch Dis Child* 2012; 97:

43–5.

20. Rajindrajith S, Mettananda S, Devanarayana NM. Constipation during and after the civil war in Sri Lanka: a paediatric study. *J Trop Pediatr* 2011; 57: 439–43.

21. Levine MD, Mazonson P, Bakow H. Behavioural symptom substitution in children cured of encopresis. *Am J Dis Child* 1980; 134: 663–7.

22. Cox DJ, Morris JB, Borowitz SM, Sutphen JL. Psychological differences between children with and without chronic encopresis. *J Pediatr Psychol* 2002; 27: 585–91.

23. van der Plas RN, Benninga MA, Redekop WK, Taminiau JA, Buller HA. Randomised trial of biofeedback training for encopresis. *Arch Dis Child* 1996; 75: 367–74.

24. Benninga MA, Voskuijl WP, Akkerhuis GW, Taminiau JA, Buller HA. Colonic transit times and behavioural profiles in children with defecation disorders. *Arch Dis Child* 2004; 89: 13–6.

25. van Oudenhove L, Aziz Q. Recent insight on central processing and psychological processes in functional gastrointestinal diseases. *Dig Liver Dis* 2001; 41: 781–8.

26. Grover M, Dorssman DA. Centrally acting therapies for irritable bowel syndrome. *Gastroenterol Clin North Am* 2011; 40: 183–206.

27. Benninga MA, Voskuijl WP, Taminiau JA. Childhood constipation: is there new light in the tunnel? *J Pediatr Gastroenterol Nutr* 2004; 39: 448–64.

28. Klauser AG, Voderholzer WA, Heinrich CA, Schindlbeck NE, Muller-Lissner SA. Behavioural modification of colonic function: can constipation be learned? *Dig Dis Sci* 1990; 35: 1271–5.

29. Bampton PA, Dinning PG, Kennedy ML, Lubowski DZ, Cook IJ. The proximal colonic motor response to rectal mechanical and chemical stimulation. *Am J Physiol Gastrointest Liver Physiol* 2002; 282: G443–9.

30. Mollen RM, Salvioli B, Camillari M, *et al*. The effects of biofeedback on rectal sensation and distal colonic motility in patients with disorders of rectal evacuation: evidence of an inhibitory rectocolonic reflex in humans? *Am J Gastroenterol* 1999; 94: 751–6.

31. Rao SS, Hartfield RA, Slus JM, Chamberlain MJ. Psychological and physical stress induced differential effects on human colonic motility. *Am J Gastroenterol* 1998; 93: 985–90.

32. Bekkali NN, de Jong HR, van den Wingaard RM, *et al*. The role of rectal chloride secretion in childhood constipation. *Neurogastroenterol Motil* 2011; 23: 1007–12.

33. Dinning PG, Bampton PA, Andre SM, *et al*. Abnormal predefecatory colonic motor patterns define constipation in obstructed defecation. *Gastroenterology* 2004; 127: 49–56.

34. Dinning PG, Bampton PA, Kennedy NL, Lubowski DZ, King D, Cook IJ. Impaired proximal colonic motor response to rectal mechanical and chemical stimulation in obstructed defecation. *Dis Colon Rectum* 2005; 4: 1777–84.

35. Gladman MA, Lunniss PJ, Scott SM, Swash M. Rectal hyposensitivity. *Am J Gastroenterol* 2006; 101: 1140–51.

36. Backer SS, Liptak GS, Colletti RB, *et al*. Evaluation and treatment of constipation in infants and children: recommendation of the North American society of pediatric Gastroenterology, Hepatology and Nutrition. *J Pediatr Gastroenterol Nutr* 2006; 43: e1–13.

37. Benninga MA, Buller H, Heymans HS, Tytgat GN, Taminiau JA. Is encopresis always the result of constipation. *Arch Dis Child* 1994; 71: 186–93.

38. de Lorijn F, van Wijk MP, Reitsma JB, van Ginkel R, Taminiau JA, Benninga MA. Prognosis of constipation: clinical factors and colonic transit time. *Arch Dis Child* 2004; 89: 723–7.

39. Voskuijl WP, van Ginkel R, Benninga MA, Hart GA, Taminiau JA, Boeckxtaens GE. New insight in to rectal function in pediatric defecation disorders: disturbed rectal compliance is an essential mechanism in pediatric constipation. *J Pediatr* 2006; 148: 62–7.

40. Kuhn BR, Marcus BA, Pitner SL. Treatment guidelines for primary nonretentive encopresis and stool toileting refusal. *Am Fam Physician* 1999; 59: 2171–7, 2184–6.

41. Rajindrajith S, Devanarayana NM. Constipation in children: novel insight into epidemiolog, pathophysiology and management. *J Neurogastroenterol Motil* 2011; 17: 35–47.

42. Bongers MEJ, Tabbers MM, Benninga MA. Functional nonretentive fecal incontinence in children. *J Pediatr Gastroenterol Nutr* 2007; 44: 5–13.

43. Loening-Baucke V. Urinary incontinence and urinary tract infection and their resolution with treatment of chromic constipation of childhood. *Pediatrics* 1997; 100: 228–32.

44. Peeters B, Benninga MA, Hennekam RC. Childhood constipation: an overview of genetic studies and associated syndromes. *Best Pract Res Clin Gastroenterol* 2011; 25: 73–88.

45. Mugie SM, Di Lorenzo C, Benninga MA. Constipation in childhood. *Nat Rev Gastroenterol Hepatol* 2011; 8: 502–11.

46. NICE Guidelines. Constipation in children and young people. May 2010. Available at: http//www.nice.org.uk/guidance/CG99.

47. Rao SSC. Diagnosis and management of fecal incontinence. American College of Gastroenterology Practice Parameters committee. *Am J Gastroenterol* 2004; 99: 1585–604.

48. Loening-Baucke V. Encopresis. *Curr Opin Pediatr* 2002; 14: 570–5.

49. Benninga MA, Taminiau JA. Diagnosis and treatment efficacy of functional nonretentive fecal incontinence in childhood. *J Pediatr Gastroenterol Nutr* 2001; 32: S42–3.

50. Rao SS. Advances in diagnostic assessment of fecal incontinence and dyssynergic defecation. *Clin Gastroenterol Hepatol* 2010; 8: 910–9.

51. Barr RG, Levine MD, Wilkinson RH, Mulvihill D. Chronic and occult stool retention: a clinical tool for its evaluation in school-aged children. *Clin Pediatr (Phila)* 1979; 18: 677–9.

52. Blethyn AJ, Jenkins HR, Roberts R, Verrier-Jones K. Radiological evidence of constipation in urinary tract infection. *Arch Dis Child* 1995; 73: 534–5.

53. Leech SC, McHugh K, Sullivan PB. Evaluation of a method of assessing fecal loading on plain abdominal radiographs in children. *Pediatr Radiol* 1999; 29: 255–8.

54. Pensabene L, Buonomo C, Fishman L, Chitkara D, Nurko S. Lack of utility of abdominal X-rays in the evaluation of children with constipation: comparison of different scoring methods. *J Pediatr Gastroenterol Nutr* 2010; 51: 155–9.

55. Reuchlin-Vroklage LM, Bierma-Zeinstra S, Benninga MA, Berger MY. Diagnostic value of

abdominal radiography in constipated children: a systematic review. *Arch Pediatr Adolesc Med* 2005; 159: 671–8.

56. Berger MY, Tabbers MM, Kurver MJ, Boluyt M, Benninga MA. Value of abdominal radiogrpah, colonic transit time, and rectal ultrasound scanning in the diagnosis of idiopathic constipation in children: a systematic review. *J Pediatr* 2012; 161: 44–50.

57. Yuan Z, Cheng W, Hou A, *et al.* Constipation is associated with spinal bifida occulta in children. *Clin Gastroenterol Hepatol* 2008; 6: 1348–53.

58. Arhan P, Devroede G, Jehannin B, *et al.* Segmental colonic transit time. *Dis Colon Rectum* 1981; 24: 625–9.RL

59. Metcalf AM, Phillips SF, Zinsmeister AR, MacCarty RL, Beart RW, Wolff BG. Simplified assessment of segmental colonic transit. *Gastroenterology* 1987; 92: 40–7.

60. Benninga MA, Buller HA, Tytgat GN, Akkermans LM, Bossuyt PM, Taminiau JA. Colonic transit time in constipated children: does pediatric slow-transit constipation exist? *J Pediatr Gastroenterol Nutr* 1996; 23: 241–51.

61. Zaslavsky C, da Silveria R, Maquilnik I. Total and segmental colonic transit time with radio-opaque markers in adolescents with functional constipation. *J Pediatr Gastroenterol Nutr* 1998; 27: 138–42.

62. Cook BJ, Lim E, Cook D, *et al.* Radionuclear transit to assess sites of delay in large bowel transit in children with chronic idiopathic constipation. *J Pediatr Surg* 2005; 40: 478–83.

63. Ragunath N, Glassman MS, Halata MS, Berezin SH, Stewart JM, Medow MS. Anorectal motility abnormalities in children with encopresis and chronic constipation. *J Pediatr* 2011; 158: 293–6.

64. Benninga MA, Buller HA, Taminiau JA. Biofeedback in chronic constipation. *Arch Dis Child* 1993; 68: 126–9.

65. Molner D, Taitz LS, Urwin OM, Wales JK. Anorectal manometry results in defecation disorders. *Arch Dis Child* 1983; 58: 257–61.

66. Benninga MA, Wijers OB, van der Hoeven CW, *et al.* Manometry, profilometry, and endosonography: normal physiology and anatomy of the anal canal in healthy children. *J Pediatr Gastroenterol Nutr* 1994; 18: 68–77.

67. Jones NM, Smilgin-Humphreys M, Sullivan PB, Grant HW. Paediatric anal endosonography. *Pediatr Surg Int* 2003; 19: 703–6.

68. Keshtgar AS, Ward HC, Clayden GS, Sanei A. Thickening of the internal anal sphincter in idiopathic constipation in children. *Pediatr Surg Int* 2004; 20: 817–23.

69. Bekkali NL, Hagebeuk EE, Bongers ME, *et al.* Magnetic resonance imaging of the lumbosacral spine in children with chronic constipation or non-retentive fecal incontinence: a prospective study. *J Pediatr* 2010; 156: 461–5.

70. Levitt MA, Pena A. Anorectal malformations. *Orphanet J Rare Dis* 2007; 2: 33.

71. Burgers R, Di Lorenzo C. Diagnostic testing in constipation: is it necessary? *J Pediatr Gastroenterol Nutr* 2011; 53 (Suppl. 2): S49–51.

72. van den Berg MM, Hogan M, Caniano DA, Di Lorenzo C, Benninga MA, Mousa HA. Colonic

manometry as a predictor of Caecostomy success in children with defecation disorders. *J Pediatr Surg* 2006; 4: 730–6.

73. Rappaport LA, Levine MD. Prevention of constipation and encopresis: a developmental model and approach. *Pediatr Clin North Am* 1986; 33: 859–69.

74. Levine MD. Encopresis: its potentiation, evaluation and alleviation. *Pediatr Clin North Am* 1982; 29: 315–30.

75. van der Plus RN, Benninga MA, Taminiau JA, Buller HA. Treatment of defecation problems in children: the role of education, demystification and toilet training. *Eur J Pediatr* 1997; 156: 689–92.

76. Gray M. Preventing and managing perineal dermatitis: a shared goal for wound and continent care. *J Wound Ostomy Continence Nurs* 2004; 32 (Suppl. 1): S2–9.

77. Leung FW, Rao SS. Fecal incontinence in elderly. *Gastroenterol Clin North Am* 2009; 38: 503–11.

78. Loening-Baucke V, Miele E, Staiano A. Fiber (glucomannan) is beneficial in the treatment of childhood constipation. *Pediatrics* 2004; 113: e259–64.

79. Chmeilewaska A, Horvath A, Dziechciarz P, Szajewska H. Glucomannan is not effective for the treatment of functional constipation in children: a double blind, placebocontrolled, randomized trial. *Clin Nutr* 2011; 30: 462–8.

80. Castillejo G, Bullo M, Anguera A, Escribano J, Salas-Salvado J. A controlled, randomized, double-blind trial to evaluate the effect of a supplement of cocoa husk that is rich in dietary fiber on colonic transit in constipated pediatric patients. *Pediatrics* 2006; 118: e641–6.

81. Ooms LA, Degryse AD, Janssen PA. Mechanisms of action of loperamide. *Scand J Gastroenterol* 1984; 96(Suppl.): 145–55.

82. Sandu BK, Tripp JH, Candy DC, Harries JT. Loperamide: studies on its mechanism of action. *Gut* 1981; 22: 658–62.

83. Read M, Read NW, Barber DC, Duthie HL. Effects of loperamide on anal sphincter function in patients complaining of chronic diarrhoea with fecal incontinence and urgency. *Dig Dis Sci* 1982; 27: 807–14.

84. Voskuijl WP, van Ginkel R, Taminiau JA, Boeckxtaens GE, Benninga MA. Loperamide suppositories in an adolescent with childhood-onset functional non-retentive fecal soiling. *J Pediatr Gastroenterol Nutr* 2003; 37: 198–200.

85. Youssef NN, Peters JM, Henderson W, Shultz-Peters S, Lockhart DK, DiLorenzo C. Dose response of PEG 3350 for the treatment of childhood fecal impaction. *J Pediatr* 2002; 141: 410–4.

86. Guest JF, Candy DC, Clegg JP, *et al.* Clinical and economic impact of using macroglo 3350 plus electrolytes in an outpatient setting compared to enemas and suppositories and manual evacuation to treat paediatric faecal impaction based on actual clinical practice in England and Wales. *Curr Med Res Opin* 2007; 23: 2213–25.

87. Pashanker DS, Bishop WP. Efficacy and optimal dose of polyethylene glycol for treatment of constipation and encopresis in children. *J Pediatr* 2001; 139: 428–32.

88. Candy DC, Edwards D, Geraint M. Treatment of faecal impaction with polyethylene glycol plus electrolytes (PEG+E) followed by a double blind comparison of PEG+E versus lactulose as maintenance therapy. *J Pediatr Gastroenterol Nutr* 2006; 43: 65–70.

89. Pijpers MA, Tabbers MM, Benninga MA, Berger MY. Currently recommended treatments of childhood constipation are not evidence based: a systematic literature review on the effects of laxative treatment and dietary measures. *Arch Dis Child* 2009; 94: 117–31.

90. Perkins J. Constipation in childhood: a controlled comparison between lactulose and standardized senna. *Curr Med Res Opin* 1977; 4: 540–3.

91. van Ginkel R, Benninga MA, Blommaart PJ, et al. Lack of benefit of laxatives as adjunctive therapy for functional nonretentive fecal soiling in children. *J Pediatr* 2000; 137: 808–13.

92. Di Lorenzo C, Benninga MA. Pathophysiology of pediatric fecal incontinence. *Gastroenterology* 2004; 126: S33–40.

93. Loening-Baucke V. Modulation of abnormal defecation dynamics by biofeedback treatment in chronically constipated children with encopresis. *J Pediatr* 1990; 116: 214–22.

94. van der Plas RN, Benninga MA, Buller HA, et al. Biofeedback training in treatment of childhood constipation: a randomized controlled study. *Lancet* 1996; 348: 776–80.

95. Borowitz SM, Cox DJ, Sutphen JL, Kovatchev B. Treatment of childhood encopresis: a randomized trial comparing three treatment protocols. *J Pediatr Gastroenterol Nutr* 2002; 43: 378–84.

96. Brazzelli M, Griffiths P. Behavioural and cognitive interventions with or without other treatments for the management of fecal incontinence in children. *Cochrane Database Syst Rev* 2006; 19: CD002240.

97. Marshall J, Hutson JM, Anticich N, Stanton MP. Antegrade continence enemas in the treatment of slow-transit constipation. *J Pediatr Surg* 2001; 36: 1227–30.

98. van Ginkel R, Reitsma JB, Buller HA, van Wijk MP, Taminiau JA, Benninga MA. Childhood constipation: longitudinal follow-up beyond puberty. *Gastroenterology* 2003; 125: 357–63.

99. Pijpers MA, Bongers ME, Benninga MA, Berger MY. Functional constipation in children: a systematic review on prognosis and predictive factors. *J Pediatr Gastroenterol Nutr* 2010; 50: 256–68.

Aliment Pharmacol Ther. 2013;37(1):37-48. © 2013 Blackwell Publishing