1

```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                        JACKSONVILLE DIVISION

 3   UNITED STATES OF AMERICA,      Jacksonville, Florida

 4           Plaintiff,             Case No. 3:14-cr-40-J-25MCR

 5   -vs-                           Wednesday, February 25, 2015

 6   CHARLES FRANKLIN HUDSON, JR.,  10:00 a.m.

 7           Defendant.             Courtroom 10C
     _____

 8

 9                    TRANSCRIPT OF SENTENCING
             BEFORE THE HONORABLE HARVEY E. SCHLESINGER
10                  UNITED STATES DISTRICT JUDGE

11

12                    A P P E A R A N C E S

13   GOVERNMENT COUNSEL:

14        Rodney Brown, Esquire
          United States Attorney's Office
15        300 North Hogan Street, Suite 700
          Jacksonville, FL  32202

16

17   DEFENSE COUNSEL:

18        Roland Falcon, Esquire
          Law Office of Roland Falcon
19        233 East Bay Street, Suite 1010
          Jacksonville, FL  32202

20

21   OFFICIAL COURT REPORTER:

22        Shelli Kozachenko, RPR, CRR
          221 North Hogan Street, #185
23        Jacksonville, FL  32202
          Telephone:  (904) 301-6842

24
                         (Proceedings reported by stenography;
25                          transcript produced by computer.)
```

# T A B L E   O F   C O N T E N T S

**EXHIBITS RECEIVED**                                    Page No.

COURT'S EXHIBIT 1 ...........................        7

<u>P R O C E E D I N G S</u>

Wednesday, February 25, 2015                          10:00 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  United States District in and for the Middle District of Florida is now in session, the Honorable Harvey E. Schlesinger presiding.

Please be seated.

THE COURT:  Call the next case.

COURTROOM DEPUTY:  Case No. 3:14-cr-40-J-20MCR, United States of America versus Charles Franklin Hudson, Jr.

Counsel, please state your presence for the record.

MR. BROWN:  Rodney Brown for the United States.  Good morning.

MR. FALCON:  Good morning, Your Honor.  Roland Falcon on behalf of Mr. Hudson.

THE COURT:  With respect to this case, I was handed a letter this morning from Tonya Smith, who I assume, from all of the initials after her name, that she must be a social worker or a nurse.  I can't tell which.

Do you know what she is?

MR. FALCON:  Yes, Your Honor.  I believe she's a nurse, psychiatric nurse, Your Honor, at the Baker County Jail.

THE COURT:  Have you seen a copy of this?

MR. BROWN:  Yes, Your Honor.  We have no objection to it.

1           THE COURT:  Well, I plan on putting that in as a

2    Court exhibit.

3           But the question is I have no idea what the

4    medication is that the defendant is taking, and it says right

5    here that he suffers from major depressive disorder

6    recurrent-moderate, and I have no idea if anyone is suggesting

7    to the Court that the defendant should be examined.

8           I assume from what she said here that he has been

9    examined by somebody, by a Dr. Amole, but she can't send

10   Dr. Amole's records because of HIPAA.

11          So now I'm sitting up here, and how do I know whether

12   or not this man is competent or not?

13          MR. FALCON:  Your Honor, if I may?

14          Your Honor, as you can tell from the letter, we

15   attempted to get some of the records, at least to be able to

16   determine or at least provide the Court some analysis on

17   Mr. Hudson.  I realize that she went into several factors.

18          I've spoken to Mr. Hudson.  I feel he's competent.

19   There are issues that basically -- especially the depression

20   that he's suffering from, as detailed in the letter.  As far as

21   the medication, I do not know, you know, how it affects the

22   mind or the body and the purpose of it.

23          THE COURT:  I don't know either.

24          MR. FALCON:  And, Your Honor, my thought on this at

25   least was initially to get information from the doctor

1   regarding Mr. Hudson.  As you can see from the letter, that

2   attempt was unsuccessful.

3           THE COURT:  Well, if he's examined him, I assume that

4   he's come up with some diagnosis.

5           MR. FALCON:  I would imagine, Judge.

6           THE COURT:  And it's as simple as ABC.

7           Why don't we have the doctor here with his medical

8   report and have him tell me whether the man is competent or

9   not?

10          MR. FALCON:  We feel he's competent, Your Honor.

11          THE COURT:  I understand what you feel.

12          MR. FALCON:  And, Judge, as you can see from the

13  letter, it was on the 20th that it was faxed over to me -- it

14  should be on the left-hand -- top left-hand corner -- at 1608

15  hours, which is 4:08.

16          That's why this is late.  I didn't mean to make it

17  part of the record, Your Honor.

18          THE COURT:  Well, let's --

19          MR. FALCON:  I just wanted to --

20          THE COURT:  I remember a very interesting Fifth

21  Circuit case.  Unfortunately since 1970 some time has passed,

22  but I remember standing in front of Judge Charles R. Scott, who

23  made a comment when he sentenced a bank robber to 25 years, and

24  his comment was, "When you get to prison, they'll straighten

25  your mental condition out."

1    And it came right back when he filed a 2255, and the

2    Fifth Circuit said, "If you were concerned about his mental

3    condition, why didn't you determine whether he was competent?"

4    Now, he was competent, but it went around the mulberry bush.

5    And my inclination is why should I take a chance when

6    I have no idea what this nurse is talking about, and I have no

7    idea -- depression doesn't mean that somebody's incompetent,

8    but that's for a doctor to determine, not for me --

9    MR. FALCON:  I agree, Your Honor.

10   THE COURT:  -- until I have some medical information.

11   MR. FALCON:  As you can --

12   THE COURT:  So where is -- do you know where this

13   doctor is?

14   MR. FALCON:  Your Honor, I never -- I guess it's

15   Dr. Amole's records that I was attempting to get at, at least

16   to review it for my own -- for my own benefit, but those

17   weren't available.  I do not know this medical man.

18   And as you can see, Your Honor, they went for the

19   Title 45, Section 164 --

20   THE COURT:  Well, she can cite whatever she wants.  I

21   have that, okay?  I also have, in addition to the presentence

22   report -- and I'll go through them in chronological order.

23   MR. FALCON:  May I sit down, Judge?

24   THE COURT:  Yes, feel free.

25   The first thing that was filed in this case, in

1 addition to the presentence report, which is dated February

2 5th, docket entry No. 48, which is a sentencing memorandum and

3 a motion for a sentencing variance from the guidelines;

4 document No. 49, which is the United States' notice of intent

5 to submit videos for court review prior to sentencing; docket

6 entry No. 52, United States' sentencing memorandum; docket

7 entry No. 53 is Hudson's notice of filing comprehensive

8 mitigation report prepared by Cord Strategies.  I believe that

9 was the one that Mr. Dawson did.

10        Document entry No. 54 is the defendant's opposition

11 to the government's intent to use child pornography videos at

12 sentencing, and then the one that I received today that I said

13 I'll mark as Court Exhibit No. 1.

14    (Court's Exhibit 1 was received in evidence.)

15        THE COURT:  So let me just find out from Mr. Brown,

16 do you have any comment, first of all, on the issue with

17 respect to the defendant's competency?

18        MR. BROWN:  Your Honor, there has been, during the

19 prosecution and investigation of this case, no information that

20 would lead the United States or its agents to believe that the

21 defendant is not competent in this case.

22        He was interviewed twice by law enforcement at the

23 time -- or at or near the time of his arrest.  He has appeared

24 in court.  He's been responsive to the Court's questions, the

25 magistrate court's questions.

1              Despite the fact that he indicates depression, as the

2     Court already said, depression does not mean incompetency.  And

3     so I'm confident, based upon the record, that the defendant is

4     competent to proceed, and I'll defer to the Court for whatever

5     decision that you think is appropriate.

6              THE COURT:  Well, the statute specifically addresses

7     an issue of what -- the findings that the Court would need to

8     make to determine whether a defendant is competent or is not

9     competent.

10              I'm not confident enough, now that that letter has

11     been brought to the Court's attention, without seeing the

12     actual diagnosis and perhaps having someone who's trained in

13     the field to answer the question with respect to the

14     defendant's understanding of the nature of the proceedings and

15     his ability to assist counsel.

16              I appreciate everybody telling me they think that he

17     is, but I'm not going to proceed without having some type of a

18     proceeding.  And I think the easiest way to do this -- let me

19     just look on my calendar here.

20              I have a sentencing -- do you want to use that same

21     doctor, or do you think that he needs -- I don't see the need

22     to spend the money to have him reexamined if a doctor has a

23     diagnosis.

24              MR. BROWN:  May we consult, Your Honor?

25              THE COURT:  Sure.

1          MR. BROWN:  Your Honor, I talked with Mr. Falcon

2     about the issue, and it may be easier to simply have an

3     independent specialist, ordinarily someone that the United

4     States selects that we use all the time --

5          THE COURT:  Then that --

6          MR. BROWN:  -- because -- and the reason I say that

7     is because apparently there are some financial issues.  There

8     are some issues with availability, and --

9          THE COURT:  You mean of this doctor?

10         MR. BROWN:  That's right.

11         THE COURT:  Well, all someone has to do is issue a

12    subpoena for the medical records and have him show -- I don't

13    need to see him, but you want to go ahead, then -- how long do

14    you think it would take?  I'll just reschedule the sentencing.

15    That's all.

16         MR. BROWN:  I'm not sure, Your Honor.  Usually with

17    cases that we have down at the magistrate court level, it's

18    usually about two weeks for an appointment and another two

19    weeks to get a report --

20         THE COURT:  Okay.

21         MR. BROWN:  -- generally speaking.

22         THE COURT:  Just a second.  Let me give you a date

23    here, and . . .

24         MR. BROWN:  Your Honor, I think defense counsel

25    should be heard about --

1          THE COURT:  Okay.

2          MR. BROWN:  -- his opinions about it.  He seems to

3    express some concern that the United States is selecting the

4    doctor, which is just a routine thing.  I'm offering to do that

5    to expedite the process, so . . .

6          MR. FALCON:  If I may, Your Honor?

7          Judge, as far as Mr. Hudson's evaluation to determine

8    whether he's competent to proceed in this matter, I don't have

9    any problem being diagnosed for the specific purpose of

10   determining whether he's competent to proceed.

11         I would like an independent -- not someone from my

12   office or the government's office, someone independent, solely

13   hired by the Court, to determine whether Mr. Hudson is

14   competent to proceed at this stage of his case.

15         I attempted to get the medical records.  They

16   wouldn't make them available.  I understand the HIPAA rules,

17   and I will abide by them.  I asked them to provide me a letter

18   at least to -- if they reviewed their medical records to at

19   least send a letter to provide me with some information of the

20   status, since Mr. Hudson had been -- been seen by medical

21   personnel.

22         So I don't have any problem with that, Judge.  The

23   problem is that to bring in a doctor will cost money, and at

24   this point in time, I just don't have it to bring him in.  Now,

25   he's going to charge a certain percentage to testify about

1   Mr. Hudson, and I just -- financially, it's just not available

2   right now.

3           THE COURT:  Okay.  I'm going to go ahead and

4   reschedule the sentencing until 10 o'clock on Wednesday, April

5   8th, and at the same time I'm going to schedule a competency

6   hearing before me, and that should give you enough time to get

7   it done.  That's about six weeks from today.

8           Now, with respect to the other issues, can you

9   prepare the necessary order and I'll sign it today?

10          MR. BROWN:  Yes, Your Honor.  That assumes that we're

11  just going to routinely pick the --

12          THE COURT:  You've got it.

13          MR. BROWN:  Understood.

14          THE COURT:  You've got the burden.  You can pick the

15  doctor, and if Mr. Falcon doesn't believe that the doctor has

16  made the proper diagnosis, he knows how to ask the Court to

17  give him his own doctor.

18          And maybe the doctor can go ahead and get the records

19  from -- where is he being housed, at Baker County?

20          MR. FALCON:  He is, Your Honor.

21          THE COURT:  Okay.  Can get the records from the Baker

22  County facility.

23          Now, that --

24          MR. BROWN:  Your Honor --

25          THE COURT:  Yes.

1       MR. BROWN:  -- just one more thing.

2       THE COURT:  That's okay.

3       MR. BROWN:  May I ask the Court to consider April

4  15th instead of April 8th simply because I think I'm going to

5  be in trial that week?

6       THE COURT:  You think you have a trial that week?

7       MR. BROWN:  I do, Your Honor.

8       THE COURT:  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

9  13, 14, 15.  I have 15 trials that week.

10       What trial are you doing?

11       MR. BROWN:  To be honest with you, I can't recall.  I

12  just know I have several that are set.

13       THE COURT:  Well --

14       MR. BROWN:  If the Court wants to let it ride and

15  we'll see what happens --

16       THE COURT:  No.  I can do it the 15th.  Let me just

17  look on my calendar here.

18       Actually, you tell me how long this is going to take,

19  because I already have four sentencings and some status

20  conferences and a revocation hearing for the 15th.

21       MR. BROWN:  I would expect --

22       THE COURT:  Let me look at the week before that.

23  Hang on just a second.

24       Wednesday -- look on Wednesday, the 1st.  Didn't we

25  continue that pretrial conference because we were going to move

1   the --

2        COURTROOM DEPUTY:  They haven't called back with the

3   date, but technically, yes, sir.

4        THE COURT:  Okay.  So let's make it -- how about

5   10 o'clock on the 1st?

6        MR. BROWN:  Of April, Your Honor?

7        THE COURT:  Yes.

8        MR. BROWN:  United States will be ready, assuming the

9   competency --

10        THE COURT:  Are you okay then?

11        MR. FALCON:  Yes, Your Honor.

12        THE COURT:  Okay.  Now let's take care of the --

13        MR. FALCON:  Your Honor, what time on the 1st?

14        THE COURT:  Excuse me?

15        MR. FALCON:  Did you give a time on the 1st?

16        THE COURT:  10 o'clock.

17        MR. FALCON:  10 o'clock.  Thank you, Judge.

18        THE COURT:  Okay.  Let me do this too.  I see a

19   number of people out here, and I don't know who they're here

20   for.

21        Do we have any victims or anybody that's going to put

22   on any witnesses?  We could do that today so they don't have to

23   come back.

24        MR. BROWN:  Your Honor, can I confer with the

25   victim's family just briefly?

```
 1              THE COURT:  Sure.  And then I'll get into this
 2    question about the video.
 3              MR. BROWN:  Yes, Your Honor.
 4         (Brief pause.)
 5              MR. BROWN:  I spoke with the victim's family.  They
 6    will be here on April 1st, and they would prefer to proceed
 7    that day.
 8              THE COURT:  Okay.  So I'll -- how long do you think
 9    we might need, the whole day?
10              MR. BROWN:  I don't think so, Your Honor.
11              THE COURT:  A few hours?
12              MR. BROWN:  A few hours --
13              THE COURT:  Okay.  So we'll put --
14              MR. BROWN:  -- or less.
15              THE COURT:  Okay.  We'll put nothing on for the rest
16    of the morning to make sure that we have that.
17              Okay.  Now, I'm going to take up this issue with
18    respect to the video.  There were the two documents that I
19    mentioned previously, 49 and 54.
20              Marsha, that's Court Exhibit No. 1 for today.  Okay.
21              First, I'll start with this premise.  If you read the
22    presentence report itself, I believe beginning on page 6, the
23    bottom of page 6, the forensic analysis of the digital media
24    material, through page 8, specifically in paragraphs 19(a),
25    (b), (c), (d), (e), there is a pretty vivid description of the
```

1   material.

2          So I understand what the government has asked.  I

3   understand what Mr. Falcon has objected to.  I'll listen to

4   what anybody has to say about the issue of whether or not the

5   Court needs to view the material that the government would like

6   the Court to see.

7          And I'll start with being the first one after the

8   hearing that we had -- I don't remember whether it was last

9   week or two weeks ago when we had the government's

10  cross-examination of -- I guess she's going to be the

11  defendant's star witness in every child pornography case trying

12  to insist that she's not an advocate for anything but would

13  like the guidelines and the courts to understand that the

14  sentences ought to be based upon statistical analysis.

15         And if she was here, I would tell her, "If you're out

16  there pitching a point of view, you're an advocate, and I don't

17  care whether it's based on science or whatever."

18         I just happen to read every single morning, Monday

19  through Friday, an e-mail that I get from Washington which is

20  called *The Judiciary in the News*, which is a gathering of all

21  the news material about federal courts and congressional action

22  involving the federal judiciary from all the major newspapers

23  and magazines around the country.

24         And I have read, of course, with great interest over

25  the last year why powder cocaine and crack cocaine should be

1    viewed the same, why the Department of Justice believes that

2    some people who were hit by the mandatory minimum sentences

3    that they asked Congress to pass should be changed, why the

4    Sentencing Commission should go up or go down on certain

5    offenses, and of course the last few months, the stories about

6    who in the United States Senate is sponsoring legislation to do

7    away with mandatory minimums in certain areas.

8            So as I said at that hearing and I'll say it again

9    here, it's nice to see that from time to time people realize

10   errors that are being made.  And when we're dealing with

11   sentencings of defendants, we're dealing with human beings, and

12   I dare say somewhere down the road with respect to child

13   pornography cases, I would assume the same thing will probably

14   come to light.

15           Some of it did from the defense witness, but I'm

16   bound, as both of you know, to start with the guideline

17   calculations first, although they're advisory, and to work from

18   there.

19           So the question for me to decide at this juncture is

20   why should I look at a video of something that's aptly

21   described by the probation officer?  And I think I have a

22   fairly good idea -- I wouldn't call it fairly.  I think I have

23   an excellent idea of what I'm dealing with at this juncture.

24           Now, I haven't heard from whoever's going to testify

25   at sentencing, and that's why, until the day that I can't stand

 1   vertically and can't sit in the courtroom and do the job that I
 2   do, I never decide a particular sentence until I've heard from
 3   everybody that I need to hear from and decide what to do.
 4           So I'll listen to Mr. Brown -- you filed it first --
 5   and then listen to Mr. Falcon.
 6           And what I'm basically interested in, if you can cite
 7   a case that says, "This is a necessity and you have to do it."
 8   Nobody, as far as I can tell, found one way or the other.
 9           Are there any or are there not?
10           MR. BROWN:  May I confer with the family just for one
11   moment?
12           THE COURT:  Sure.
13           MR. BROWN:  Your Honor is correct that every
14   sentencing deals with human beings, and too often we think of
15   the human being involved as being the defendant, and that's
16   true.  But in --
17           THE COURT:  There's a victim here and in no uncertain
18   terms a statute that has been enacted and a good reason for it.
19   This is a separate category of cases.
20           There are some where Congress has said, "This is what
21   you will do," and I'm not quarreling with that, and I'm not
22   quarreling with anybody who you want to put on to testify about
23   what there is.  The question is, why do I need to look?
24           This -- it's obvious that the Supreme Court had a
25   change of heart as to what went on.  Many, many years ago --

1    and I -- for some reason I think the man's name was Smith, but

2    I'm not sure.

3              There was a murder case in state court.  The man --

4    the defendant in the case was a disc jockey, and he discovered

5    that his wife was having an affair when he was working at

6    night.  And if I remember the facts correctly, one night he put

7    on -- of course, this is many, many years ago.  He put on a

8    33-and-a-third record, which if my age isn't showing usually

9    played for about an hour, left the studio, went home, actually

10   found the man in the middle of an act with his wife, killed the

11   man, and buried him.

12             And at trial the defendant was willing to stipulate

13   to the death of the victim, but the State insisted that it was

14   entitled to show the photographs of the actual digging up of

15   the grave and retrieving the body of the deceased.

16             And the First DCA reversed the conviction and said

17   that if the defendant was willing to stipulate to the death of

18   the decedent in the case, that all that the pictures did was

19   inflame the jury, and the man had another trial.

20             So the question here is -- and I'm sure you are as

21   well aware of this as I am.  We survey all of the jurors after

22   they've sat in a case.  And I don't have to, I think, tell you

23   that the biggest complaint in child pornography cases, and in

24   some regular pornography cases, are jurors complaining, "I

25   didn't volunteer for this job.  You drafted me, and it was not

1    a very pleasant experience to go through that."

2            So the issue is if I have this big description, which

3    I'll conclude is pretty graphic, and if you can put on any

4    witnesses, and so can the defendant, to testify about what went

5    on in this case, why is it necessary for the Court to go ahead

6    and watch the videos?

7            MR. BROWN:  These are difficult cases, Your Honor.

8            THE COURT:  Very difficult.

9            MR. BROWN:  They're very difficult for a number of

10   reasons.  They're difficult for the Court.  They're difficult

11   for the jurors.  They're difficult for the investigators, and

12   they're difficult for the prosecutors.

13           In this particular case the agents had to view these

14   videos because they had to be able to describe and to be able

15   to articulate to the prosecutor and then to the grand jury as

16   to what -- what they detailed.

17           The difference, I would say, between the First DCA

18   case that you cited and also the case law that's cited by the

19   defendant in his objection to the Court looking at the images,

20   is that those involved jurors.

21           Juries -- the three that were in the defendant's

22   papers were capital sentencing juries, and the Court, as

23   Mr. Falcon actually correctly articulated, reversed itself and

24   enabled the future juries to consider victim impact statements.

25           This is different than that.  We're asking the Court

1   that is going to be determining the sentence to view evidence

2   in the case.

3           And so what is the evidence?  The evidence has --

4           THE COURT:  What if I was blind?  And we have had a

5   blind judge in this circuit, and I guarantee you he wasn't able

6   to see one video that anybody wanted to show him, and that

7   didn't keep him from doing this job.

8           MR. BROWN:  I -- that's a -- I've never thought of

9   that before, I have to say.  If the judge was competent to sit

10  as a judge, I would say he'd be competent to handle any case.

11  And essentially that's what we're trusting you to do.

12          You know, 3553(a) sets forth the factors that the

13  Court has to consider in evaluating what sentence to impose on

14  a defendant.  And part of those factors, the first two are

15  nature and circumstances of the offense and history and

16  characteristics of the defendant.

17          In this case it is our position that to fully grasp

18  the nature of the evidence in this case, because of the

19  attitude, because of the conversations, because of the conduct

20  of the defendant, that it is important that the Court view the

21  videos.  Now, 3553(a) takes that into account, and that's what

22  we filed our notice under.

23          Also, Section 3661 is important in this case too.  I

24  didn't cite that in the notice, but sort of as an afterthought,

25  when I got the opposition, I took a look at it.  And it says --

1    it's Title 18, United States Code, Section 3661 entitled Use of

2    Information for Sentencing.

3          And it says, and I quote, "No limitation shall be

4    placed on the information concerning the background, character,

5    and conduct of a person convicted of an offense which a court

6    of the United States may receive and consider for purpose of

7    imposing an appropriate sentence."  And so that's a powerful

8    statute which I would ask the Court to consider as well.

9          In -- the defendant has filed a 13-page memorandum

10   that most of it concerns the nature -- or the history and

11   characteristics of the defendant.  He has filed a 36-page

12   memorandum from Mr. Dawson, as you correctly stated, that is

13   a -- what's called a comprehensive mitigation report.

14         And that mitigation report sets forth not only

15   opinions about the sentencing guidelines, but it also sets

16   forth in detail, once again, the history and characteristics of

17   this defendant.  So the defendant wants you to look at history

18   and characteristics of the defendant, for obvious reasons,

19   because arguably there's mitigation.

20         The United States is simply asking for the same

21   thing.  The victim has made a decision not to appear.  The

22   victim's family have made a decision to appear.  And in

23   conferring with the victim's family, they -- when I explained

24   to them the issue, they asked the Court to view the videos too

25   so that the Court can fully grasp the arrogance, the

 1   callousness, and the selfishness of the defendant.

 2          And so that's why we're asking that --

 3          THE COURT:  Which is described in detail, I assume --

 4   let me not speak -- I'm reading from the bottom of page 6:

 5   "Forensic review of five SD media cards revealed 779 image and

 6   video files depicting sexually exploitive conduct involving,"

 7   and it goes on and on and on and on.

 8          And then it says, "The digital media contains graphic

 9   depictions of . . . in bondage, restraint, and/or blindfolded.

10   Below are descriptions of the five videos found on the SD media

11   cards."

12          And then there's -- (a) is a six-minute-and-five-

13   second video.  Count Two is ten minutes and 30 seconds.  Count

14   Three is -- that's the December 8th, 2011; length, 12 minutes

15   and 13 seconds.  (D), Count Three, the length, five minutes and

16   38 seconds; Count Four, 13 minutes and 52 seconds.

17          And I assume -- I don't know.  I don't know if the

18   agent saw the presentence report.  I assume that the probation

19   officer got the information for the -- what he wrote in here

20   from the case report --

21          MR. BROWN:  That's correct.

22          THE COURT:  -- which is in pretty bad and descriptive

23   language.

24          I mean, what more does somebody have to read?  I'll

25   just read part of it.  How about someone gagging and vomiting?

1   That's a pretty good description.  I mean, for someone who's

2   going to be 75 years old, I think I know what gagging and

3   vomiting means.

4        So the question that I'm sitting here pondering --

5   and I understand about the victim thing, but I think that in my

6   lifetime I've seen enough to realize what it means when I read

7   it.

8        The question is -- and to tell you the truth, if I do

9   decide to watch it, I'm not going to watch it on the day that

10  we're going to have the sentencing.  I'll watch it beforehand

11  because I don't want to waste the time of all the people who

12  are coming.

13       What is the length of time that you anticipate

14  whatever it is that you want to show me is?

15       MR. BROWN:  The two videos together are 23 minutes.

16  The Court can look at as little or as much as it wishes.  I

17  didn't anticipate, you know, being with the Court.  I thought

18  that the Court could take it under advisement in the privacy of

19  chambers and see whatever the Court needed to see.

20       THE COURT:  Okay.

21       MR. BROWN:  And that was sort of the -- our plan.

22       It is unusual, outside of a trial scenario, that we

23  actually ask the Court, any Court, to look at images.  You

24  know, they say a picture is worth a thousand words, and a video

25  is --

```
 1              THE COURT:  It is.
 2              MR. BROWN:  And --
 3              THE COURT:  But if I -- there -- and I assume there
 4    is nothing that either the defendant or the defendant's
 5    attorney can say to me, with respect to what went on, that
 6    changes anything in the presentence report factually because
 7    there were no objections in the addendum.  So I don't
 8    anticipate that that's something that I need to worry about.
 9              Okay.  I think that I understand what you're trying
10    to get across.  Let me listen to the defense.
11              MR. BROWN:  Can I just say one more thing?
12              THE COURT:  You can say more than one.  Go ahead.
13              MR. BROWN:  Thank you.
14              You asked me if there is a case that says you have to
15    look at it.
16              THE COURT:  Yes.
17              MR. BROWN:  There's not a case, Your Honor.  I have
18    not seen a case where -- and I haven't looked all over the
19    waterfront, but I have not seen a case or heard of a case where
20    a Court was criticized for looking at images.
21              THE COURT:  Yeah.  Oh, I understand that.  Yes.
22              MR. BROWN:  I have seen cases where courts were
23    criticized -- I haven't seen one in a sentencing context, but I
24    saw one in a 404(b) context, that the United States -- this is
25    the case of the United States versus Loughry, L-o-u-g-h-r-y.
```

1    It's at 660 F.3d 965.

2            THE COURT:  Wait a minute.  Give me that again,

3    660 --

4            MR. BROWN:  I have the case, Your Honor.

5            THE COURT:  Oh, okay.

6            MR. BROWN:  And it's a Seventh Circuit case, and in

7    that case the district court -- it was found that the district

8    court used its discretion by failing to review uncharged videos

9    before admitting them.

10           Now, that was in a trial scenario so it's arguably

11   distinguishable from that, but the Court -- the appellate court

12   found that the district judge had abused its discretion by not

13   looking at the videos and simply relying upon the descriptions

14   that the government gave, which is essentially what we're doing

15   here.

16           That -- again, it's distinguishable.  We're not

17   talking about trial.  Obviously, they were showing it to a

18   jury.  The stakes are much higher.  But I get back to showing

19   evidence to a judge is different than showing evidence to a

20   jury.  We trust the courts to be impartial, fair entities, if

21   you will, and juries have -- the standard is different for

22   juries.

23           And the other case that I just want to point out is

24   the one that I had mentioned in the notice, and that is *United*

25   *States versus Cunningham* F.Supp.2d 844.

1          And that was a case where it was -- it was -- the

2    judge essentially asked to look at the images prior to the

3    sentencing, and I'll quote from page 854.

4          It says:

5              "The Court made its first request to view the

6          images shortly before the first sentencing hearing in

7          this matter.  At that time Agent Hagan expressed

8          surprise that the Court wished to review the images

9          in their entirety.  Agent Hagan indicated to the

10         Court that she had been the affiant in more than a

11         hundred child pornography investigations, and absent

12         a matter going forward to trial, a judge had never

13         requested to see the photographs at issue.  While

14         only a minor sampling, this revelation was shocking

15         to the Court.

16             "As detailed above, the agents handling these

17         matters were able to aptly describe the contents of

18         each image.  Those descriptions, however, are little

19         more than words on paper.  Absent examining the

20         images, one cannot get a true sense of the depravity

21         that they depict.  Thus, the Court implores any

22         reviewing court to personally examine the images at

23         issue and not simply rely on a written description of

24         their contents.

25             "The Court acknowledges that the review of such

1          images is, to say the least, uncomfortable.  There

2          are some images that are haunting and they cannot be

3          unseen.  However, any uneasiness felt by the

4          individual reviewing the image pales in comparison to

5          the harm caused by the image being created in the

6          first place."

7          Nobody wants to look at these images -- well, save

8    one, the defendant.  Nobody does.  And it's unfortunate, but to

9    prosecute and investigate these cases, we have to look at the

10   images.

11         The family and the United States think that it's

12   important for the judge to see just portions of these two

13   videos which are less than one percent of the defendant's

14   collection.

15         And so I'm going to defer to the Court.  You know, I

16   don't want to be perceived as forcing the Court to look at this

17   garbage, but I think, as I've articulated, a picture's worth a

18   thousand words, a video's worth a thousand pictures, and I

19   would just ask the Court to consider our request.

20         THE COURT:  Thank you.

21         Mr. Falcon?

22         MR. FALCON:  Thank you, Your Honor, if I may?

23         THE COURT:  Yes.

24         MR. FALCON:  Your Honor, I did a lot of research, and

25   the -- I consider the videos victim impact statements.

1    Whatever they -- they're a visual impact statement, and under

2    *Booth versus Maryland*, 482 U.S. 496, they recognize, I mean,

3    from the git-go, analyzing these videos has always been the

4    horrific nature of the videos as it pertains to the emotional

5    behavior of the people that watched.  That's always been the

6    case.

7            So I consider this a victim impact statement and

8    under *Booth Versus Maryland*, the Court came and said that --

9    concluded that victim impact statements may inflame the

10   listener and obstruct reasoning in capital sentencing.  *Booth*

11   was a death-penalty case.  I admit to that, Judge, because

12   there's not much out there regarding CP.

13           And it was reversed.  It was reversed under *Payne*

14   *versus Tennessee*, which is 501 U.S. 808.  And, Judge, what the

15   Court left, it said, "Leave it to the discretion of the Court."

16           As well as in *Jones*, which is *Jones versus United*

17   *States*, 527 U.S. 373, the Court held that victim impact

18   evidence is admissible, and we're not denying that, but it is

19   so unduly prejudicial that it renders the trial fundamentally

20   unfair, in violation of defendant's right to due process.

21           Now, I know what the government wants to do, and how

22   many times I've been in this court and other courts, Your

23   Honor, where the government comes in and says that every time

24   that child porn or that picture is viewed, it is an insult and

25   a crime against the victim.  How many times?

1          And the government is now asking this Court -- and,

2    Judge, I can tell you, he's the only one -- besides these

3    individuals, he's the only one that's seen them.  I haven't

4    seen them, and I wouldn't, and that's what I told him.

5          That basis, Judge -- and if you look at his case that

6    he just brought up, which is *United States versus Loughry*,

7    which is 660 F.3d 965, what does the Court say, Judge?  If we

8    look at page -- if we look at page 10:

9               "In contrast, the risk of unfair prejudice to Loughry

10              from the admission of the hard-core pornography was

11              substantial.  Evidence is unduly prejudicial if it

12              creates a genuine risk that emotions of the jury will

13              be excited to irrational behavior and the risk is

14              disproportionate to the probative value of the

15              offered evidence."

16          The Court further says:  "Further increasing the risk

17              of prejudice to Loughry, the government used the

18              hard-core pornography during the testimony of the

19              final witness shortly before the jury was excused to

20              deliberate.  The jury, therefore, enters its

21              deliberations under the emotional impact of the

22              uncharged videos."

23          The Court is going on -- and as I put forth in my

24    response to the government, Judge, it is an emotional factor

25    that once you watch these things, emotions will come into play,

1    and we're asking the Court, Your Honor, not to allow the

2    emotion.

3            We're asking the Court, Your Honor, to look and see

4    if Mr. Hudson has been charged under 18 U.S.C. 3553, and if the

5    Court were to charge a defendant under 3553, it has to look at

6    all the elements of the charge, and that's what we're asking

7    the Court, Your Honor.

8            Now, the Supreme Court, other courts, have determined

9    that there's an emotional impact no matter what.  I went into

10   detail in my response to the government.  I think it's

11   cumulative.  I think it's unwarranted.  I believe that the PSR

12   is sufficient enough.

13           Thank you, Your Honor.

14           THE COURT:  Anything else, Mr. Brown?

15           MR. BROWN:  Just, you know, I apologize that I missed

16   that argument about the victim impact statement because he did

17   mention that.  Mr. Falcon did mention that in his pleading.

18           But if the Court analogized -- well, I guess there's

19   two ways of looking at it:  No. 1, that it's evidence in the

20   case, and that's our primary position, that the Court should

21   view evidence in the case, albeit less than 1 percent of it.

22           And second, Mr. Falcon says it's a victim impact

23   statement.  Well, if it is to be viewed as a victim impact

24   statement, then the victim has an absolute right to be heard

25   under Rule 32 of the Federal Rules of Criminal Procedure, and

1    so that's yet another reason which I failed to articulate

2    before.

3             But I simply -- I find it interesting that the

4    defense analogizes the Court to the jury, and that is not an

5    appropriate analogy.  The cases -- the case -- the *Loughry* case

6    and the excerpts that Mr. Falcon cited had to do with inflaming

7    the jury.  And we all understand what that means, and we

8    understand why that's not appropriate, and we understand that.

9             But I would argue that it should be impossible to

10   inflame the emotions of a district judge because district

11   judges are fair, and they are impartial, and they apply the law

12   equitably and fairly.

13            THE COURT:  What is the defendant's position with

14   respect to this issue?  You've said that you have not viewed

15   what the prosecutor would like the Court to view, so -- and

16   from what I gathered, you have said this is not all of the

17   material in the counts to which he has entered a plea.

18            Am I correct?  It's part --

19            MR. BROWN:  It's only that material.  There's one

20   video for --

21            THE COURT:  All of it?  You said there was about 23

22   minutes.

23            MR. BROWN:  Well, there's 13 minutes on one and 10

24   minutes on the other --

25            THE COURT:  Okay.

1          MR. BROWN:  -- and that's Count Two and Count Four.

2          THE COURT:  And it's complete from beginning to end.

3          MR. BROWN:  Yes, sir.

4          THE COURT:  Okay.  Now, what is the defendant's

5     position, if the Court says that it is going to view the

6     material, with respect to you making sure, if you want to, that

7     that's exactly what -- the material that the government is

8     going to supply?

9          MR. FALCON:  Your Honor, I don't want to watch those

10    videos.  I don't want those images in my head or having

11    anything to do with that, and I would like to tell the Court

12    that.  I don't want it.

13         THE COURT:  Okay.  Good enough.  Okay.

14         Well, I've given you the date for the competency

15    hearing and for the sentencing.

16         If the defendant is found competent, then we'll

17    proceed on that date from the competency hearing right into the

18    sentencing.  And since it's more than a month away, I'll make

19    up my mind what to do with respect to the material.

20         And what I may wind up doing is just having you

21    prepare a disc and sending it to me, and if the defendant's

22    attorney wants a copy of the disc, you'll have to supply one to

23    him too.

24         MR. BROWN:  Well, Your Honor, we'll make it

25    available --

1          THE COURT:  Yes.

2          MR. BROWN:  -- but we won't be able to transmit it to

3     him.

4          THE COURT:  No.  I realize that.

5          Are you going to just have him -- if he desires to

6     come into your office and see it?

7          MR. BROWN:  (Nods head up and down.)

8          THE COURT:  Okay.  Okay.  Anything else?

9          MR. BROWN:  Just to clarify, would this be the United

10    States' motion for competency examination or would it be a

11    joint motion?

12         THE COURT:  No.  Mine.

13         MR. BROWN:  Okay.  Got it.

14         THE COURT:  Mine, okay?

15         MR. FALCON:  And, Your Honor --

16         THE COURT:  Both of you have said you don't see any

17    reason for the examination.  I'm just a little overcautious.

18         MR. FALCON:  Are we going to ask the -- whoever's

19    assigned to do the competency evaluation of Mr. Hudson, are

20    they going to be able to get the records from the prior doctor?

21         THE COURT:  I would hope they would try.

22         MR. FALCON:  Is there anything I can do in that

23    regard or --

24         THE COURT:  Well, I assume, and I don't have the Code

25    of Federal Regulations in front of me, that he can sign a

1  waiver of his right to privacy, and if you want to do that, do

2  that and get me the report from Dr. Amole.

3          I mean, I assume in there if he's just done a mental

4  examination, he might not have answered the series of questions

5  that the statute says need to be answered.  But he's examined

6  him, and if he wants to come up with a conclusion about the

7  four magic questions -- I don't know anything about the doctor,

8  but I assume if he's licensed to practice in the state of

9  Florida, he's good enough.  And you could not have to go

10 through everything.

11         MR. FALCON:  And, Your Honor, I did.  I had

12 Mr. Hudson provide a release, medical release under HIPAA, to

13 them, but it was still impossible to get the documentation,

14 so . . .

15         THE COURT:  Which I don't understand.

16         MR. FALCON:  I don't either, Judge, but it's --

17         THE COURT:  Well, you know, I don't have -- I don't

18 have any qualms with the Court issuing a subpoena for that

19 doctor to be here on the infamous April date, and that's his

20 problem.  Let him work it out with his schedule.

21         And he's not going to get a fee from me other than a

22 witness fee, which is what, about 50 bucks --

23         MR. FALCON:  He's not going to be happy.

24         THE COURT:  -- and he wouldn't be a happy camper.

25         But I think once your client has signed a HIPAA

1    waiver, why he won't turn the records over, I have no idea,

2    unless maybe there's something in his contract with the Baker

3    County Jail that prohibits him from doing that.

4          But the privilege belongs to the defendant, not to

5    the jail facility, so I'm willing to handle it the easiest way

6    that it needs to be handled, just out of the height of

7    precaution.

8          MR. FALCON:  And, Your Honor, I realize I got the

9    letter late.  I did try to get the records.  I received this --

10         THE COURT:  That's no -- I'm not worried about that.

11         MR. FALCON:  And what I wanted to provide to the

12   Court, Judge, is basically not that there's any mental health

13   issues with Mr. Hudson but to show how he feels for what

14   happened and, you know, what's troubling him at this point in

15   time in his life for what occurred.

16         THE COURT:  Okay.

17         MR. FALCON:  Thank you, Your Honor.

18         THE COURT:  We'll see everybody back in April.  Thank

19   you.

20         COURT SECURITY OFFICER:  All rise.

21     (The proceedings were concluded at 11:01 a.m.)

22                         -  -  -

23

24

25

```
1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4   UNITED STATES DISTRICT COURT )

5   MIDDLE DISTRICT OF FLORIDA    )

6

7           I hereby certify that the foregoing transcript is a

8   true and correct computer-aided transcription of my stenotype

9   notes taken at the time and place indicated therein.

10

11          DATED this 3rd day of April, 2015.

12

13                              s/Shelli Kozachenko
                                Shelli Kozachenko, RPR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```